W. Harley **HUXFORD** and Rae Huxford, Plaintiffs-Appellants,

v.

**UNITED STATES** of America, Defendant-Appellee.

Walter D. **TAYLOR** and Carolyn H. Taylor, Plaintiffs-Appellants,

v.

**UNITED STATES** of America, Defendant-Appellee.

No. 31077.

United States Court of Appeals, Fifth Circuit.

May 5, 1971.

See also D.C., 299 F.Supp. 218.

W. A. Gartner, Hugh F. Culverhouse, Culverhouse, Tomlinson, DeCarion & Anderson, Jacksonville, Fla., for appellants.

Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Rodger M. Moore, Janet R. Spragens, Attys., Tax Div., Washington, D. C., William H. Stafford, U. S. Atty., Pensacola, Fla., Bennett N. Hollander, Kenneth L. Bross, Attys., Tax Division, Department of Justice, Washington, D. C., of counsel, for appellee.

Before WISDOM, BELL and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

The question on appeal is whether the gains from the sale of certain timber by the J. O. Huxford Estate, Inc., a Subchapter S corporation, constitute capital gains or ordinary income for federal income tax purposes. The jury found that at the time of the sale the corporation held the timber primarily for sale to customers in the ordinary course of its trade or business. Accordingly, the trial judge entered judgment for the United States on the capital gains issue. See Int.Rev.Code of 1954, § 1221 (1). The plaintiffs-appellants, two of the corporation's four shareholders and their spouses, contend that the trial judge erred in refusing certain of their requested instructions and in denying their motions for a directed verdict and a judgment n. o. v. We find no error, and affirm.

In 1929 Mr. J. O. Huxford, Sr. began acquiring land in and around Taylor County, Florida, which bore trees suitable for the production of turpentine and other naval stores.[1] He conducted a naval stores business on the land himself through the early 1940's. In about 1943 he leased the business to two of his sons, who from that time forward ran the business with other pulpwood, turpentine, and timber-dealership operations of their own.

In order to give their younger trees room to grow, Mr. Huxford and his sons periodically cleared out dead, worked-over, and inferior trees. Some of these were sold, but they often brought very little, since their value as saw timber was limited and at least until 1950 there was no substantial local market for pulpwood.

Mr. Huxford died in 1948. The timberland he had accumulated passed to his estate. By this time the naval stores business was in decline. The turpentine trees, known in the trade as "cat faces" because the scars left on them from the extraction of turpentine resembled a cat's whiskers, were producing less and less, and synthetic substitutes were encroaching on the market for turpentine. At approximately the same time a pulpwood plant opened up nearby, and a market developed for the cat faces, which the estate began to sell in some quantity. In 1952 or 1953, the sons concluded that turpentining was doing more damage to the trees than it was worth, and all naval stores activity ceased.

In 1955 the land was conveyed by the estate to the J. O. Huxford Estate, Inc., a corporation newly formed for that purpose. The principal beneficiaries of the estate, Mr. Huxford's four children, became the sole shareholders of the corporation. By this time it was clear that the future of the land lay in tree farming, the production of "good round trees" for sale. The shareholders considered selling the entire tract to someone else who would develop it for that purpose, but could not find a buyer at a suitable price. Accordingly, they stepped up the program of site improvement. Gradually the cat faces and other inferior trees were cleared out altogether, and new trees grew in. Consistent with past practice, some young trees were planted. New roads were built on the land and new fire breaks made. For a number of years the corporation both listed and advertised itself in a directory for Taylor County as a tree farm ("WE BUY— WE SELL TREES—LOGS—PULP-

---

1. "Naval stores" refers generally to turpentine, tar, pitch, pine oil, rosin, and the other products obtained from the resin of pine and other cone-bearing trees.

WOOD"). Otherwise, the corporation did virtually no advertising or sales promotion. On its income tax returns, the corporation listed its main business as forestry and its principal product as timber. Though the corporation actually bought no timber during this period, except what stood on certain lands which it bought to fill out the original tracts, it sold some timber every year. The proceeds of these sales were reported on the corporation's income tax returns, apparently without objection by the Internal Revenue Service, as capital gains.

The transaction which has given rise to this lawsuit took place on December 12, 1960. On that date the corporation entered into an agreement with Buckeye Cellulose Corporation (Buckeye) whereby Buckeye acquired the right to remove and sell all timber then standing on the land (which by then comprised some 21,750 acres), together with certain easements and other ancillary rights. Buckeye agreed to pay the estate corporation $2,200,000 outright in equal annual installments, together with a share of the proceeds of all sales of hardwoods and cypress, and certain additional sums in the event of a subsequent rise in the prevailing local price for pulpwood. As additional consideration, Buckeye agreed to continue the estate corporation's site improvement and replanting program, employing the same equipment and techniques used by Buckeye on other timberlands under its control, and applying new techniques as they evolved. It was agreed that Buckeye would not have the right to cut and harvest any timber planted by Buckeye on the land, or any natural reproduction occurring after the execution date of the agreement. So far as the record indicates, the entire agreement is still in effect. By its terms, on March 1, 1981, the agreement terminates, and all standing timber reverts to the estate corporation.

By the time of the 1960 sale, the cat faces had all but disappeared. Of the trees standing on the tract, few or none

had ever been grown or held for use in the naval stores business. The sale comprehended all the timber then standing, which appellants concede consisted primarily of good round trees. A Buckeye official testified that when Buckeye made the purchase the necessity for selective cutting was past. The timber, he stated, had "reached a peak level of growth. It was time for the crop of timber on the land to be harvested and another crop of timber started."

Effective March 1, 1961, J. O. Huxford Estate, Inc. became a Subchapter S corporation.[2] On her federal income tax return for 1961, Mrs. Carolyn Huxford Taylor, daughter of the late Mr. Huxford, filing jointly with her husband Walter D. Taylor, reported her distributive share of that year's Buckeye payment as a long-term capital gain. W. Harley Huxford, another shareholder, likewise claimed capital-gain treatment for his share of the 1964 Buckeye payment on his joint return with his wife for 1964. The IRS determined that the income in each case constituted ordinary income, and levied additional assessments. The taxpayers paid the assessments under protest and filed suit in the court below for refunds. Their two actions were consolidated and tried to a jury on special interrogatories, resulting in a verdict for the United States on the capital gains issue. From this verdict and the judgment thereon the taxpayers appeal, contending that on all the evidence they were entitled to capital gains treatment on the income in question by virtue of Int.Rev.Code of 1954, §§ 1221 and 1231.

■■ Gains from the sale of assets held by a taxpayer "primarily for sale to customers in the ordinary course of [the taxpayer's] trade or business" are not normally capital gains. Int.Rev. Code of 1954, §§ 1221(1), 1231(b) (1) (B). Subject to exceptions not applicable in the instant case, the character of the gain on the sale of an asset by a Subchapter S corporation is deter-

2. See Int.Rev.Code of 1954, § 1371 et seq.

mined at the corporate level, and a capital gain to the corporation is a capital gain to its shareholders. Int.Rev.Code of 1954, § 1375(a); 26 C.F.R. §§ 1.1375–1(a), (d) (1970); see 7 J. Mertens, The Law of Federal Income Taxation §§ 41B., 35–.35a (1967 revision). We conclude that the proper characterization of the income involved in the instant case depends on the purpose for which the J. O. Huxford Estate, Inc. held the timber at the time of the sale.

■ The evidence fully supports the jury's conclusion that on the execution date of the Buckeye contract, the corporation was holding the timber "primarily for sale." It is undisputed that by that time, the corporation was no longer in the naval stores business, and that few or none of the trees had ever been used for the production of turpentine or anything else. The same observation disposes of the taxpayers' contention that the trees were real property used in its naval stores business, for purposes of Section 1231(b)(1) of the Code.[3] The question remaining is whether the timber is excluded from status as a capital asset by Section 1221(1).

■ The purpose of Section 1221(1) is to differentiate between the profits and losses arising from the everyday operation of a business on the one hand, and the realization of appreciation in value accrued over a substantial period of time on the other. Malat v. Riddell, 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966). Which classification is appropriate in a given case, as this Court has many times observed, is "essentially a question of fact." See United States v. Burket, 5 Cir., 1968, 402 F.2d 426, 429, and cases cited therein. In previous opinions this Court has undertaken to enumerate some of the factors which, if present in a particular case, ought to influence the trier of fact toward one classification or the other. See, e. g., United States v. Winthrop, 5 Cir., 1969, 417 F.2d 905, 909–910; Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353, 356.

■ The trial judge in the instant case instructed the jury on the language of Section 1221(1) and the distinction drawn in Malat v. Riddell, *supra,* and then discussed several specific factors suggested by the evidence presented in the case.[4]

The taxpayers contend that under the circumstances of this case the standard multi-factor type of instruction was insufficient. They argue that too little was made of one factor in particular: "liquidation." Certain decisions of this Court reflect the view that, other things being equal, gains from liquidations should be classified as capital gains where the law would require classification as ordinary income had the property been bought originally for the purpose of resale. The theory seems to be that it is unreasonable, perhaps unjust, to tax as a businessman or a dealer a party who is merely trying to recover the salvage value of an asset—particularly where he does little or nothing to enhance its value, disposes of it with a

---

3. See also Huxford v. United States, N.D. Fla., 1969, 299 F.Supp. 218.

4. The judge instructed the jury that among the factors it might consider were the extent to which the estate corporation or others acting on its behalf engaged in developing or improving the property; the continuity and frequency of its sales; the extent to which the corporation solicited customers; the proportion of the corporation's income represented by the timber sales; and the length of the period over which the corporation held the property sold. He included in his charge an

instruction on liquidation which was garbled in transcription, but which was obviously drawn from this Court's opinion in White v. Commissioner of Internal Revenue, 5 Cir., 1949, 172 F.2d 629, 630. In *White* we stated that "where the liquidation of an asset is accompanied by extensive development and sales activity, the mere fact of liquidation does not preclude the existence of a trade or business; but, where the elements of development and sales activity are absent, the fact of liquidation may not be disregarded." This was good law at the time the instruction was given, and remains so.

minimum of merchandising activity, and buys no more to replace what he has sold. Gains from liquidation, it is argued, should be treated like gains to an investor from the sale of a single speculative asset—as capital gains. *Cf.* Commissioner of Internal Revenue v. Williams, 5 Cir., 1958, 256 F.2d 152, 155; Thomas v. Commissioner of Internal Revenue, 5 Cir., 1958, 254 F.2d 233, 237. Thus, in Consolidated Naval Stores Company v. Fahs, 5 Cir., 1955, 227 F.2d 923, which involved the sale by a taxpayer corporation of lands which had been acquired (like the tract involved in the instant action) for turpentining purposes and which were obsolete for such purposes at the time of the sale, this Court held the proceeds of the sale to constitute capital gains. We reached the same result in Alabama Mineral Land Co. v. Commissioner of Int. Rev., 5 Cir., 1957, 250 F.2d 870, holding that a corporation disposing of lands acquired incident to foreclosures on railroad bonds held by its stockholders was engaged merely in "passive liquidation."

The taxpayers argue the analogies between these prior cases and the instant case forcefully and well. Nonetheless, we do not believe that the District Judge erred in declining to give highly particularized instructions based on these prior cases, or in refusing to direct a verdict based on some narrow rule extracted therefrom.

■ The sale of the trees themselves did not constitute a "liquidation" in the sense in which that term has been used in the cases on which the appellants rely. Contrary to the suggestion inherent in the appellants' requested instructions, the trees Buckeye bought were not originally acquired by the corporation "for a purpose that no longer exists or is no longer profitable." They were good round trees, many of them growing in space cleared for them by the corporation. The corporation was not reducing its holdings of assets of the type sold, with a view to eliminating such holdings altogether; on the contrary, its contract with Buckeye envisioned that in twenty years, at the termination of the contract, it would own a new crop of trees.

■ Perhaps, considering the minimal amount of active solicitation and the fact that all sales theretofore had been of clumps of cat faces and the like, a reasonably minded jury could have found that the corporation at the time of the sale to Buckeye was not engaged in any trade or business, and that the sale was incident to a long-run liquidation of the land. One of the taxpayers' witnesses testified that the reason the corporation did not sell the tract along with the trees is that neither Buckeye nor anyone else would pay more for the package than they would for the trees alone. This testimony was obviously relevant; it was part of the jury's job to assess its credibility and weight. Cf. Torrence v. Union Barge Line Corporation, 5 Cir., 1969, 408 F.2d 873, 875. The jury had also to consider the corporation's site improvement efforts from 1955 to 1960, the success of those efforts in rounding out the production of a mature crop of good round trees, Buckeye's extensive continuing commitment to reforestation, and the arrangement whereby all rights in the timber were to revert to the corporation in twenty years. Based on these considerations, a reasonably minded jury could have found that as of the time of the sale the corporation owned a tree farm, was engaged in the business of tree farming, and held the trees primarily for sale to customers in the ordinary course of that business. Compare Wineberg v. C. I. R., 9 Cir., 1963, 326 F.2d 157, 160–164; Commissioner of Internal Revenue v. Boeing, 9 Cir., 1939, 106 F.2d 305, cert. denied, 308 U. S. 619, 60 S.Ct. 295, 84 L.Ed. 517. The trial judge was correct in submitting the question to the jury. Cf. United States v. Generes, 5 Cir., 1970, 427 F.2d 279. His instructions were well adjusted to the evidence. There is no reason to disturb the jury's verdict.

Affirmed.