SUBURBAN REALTY COMPANY,
Plaintiff-Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 77–3094.

United States Court of Appeals,
Fifth Circuit.

April 7, 1980.

Gerald W. Haddock, Charles W. Hall, Houston, Tex., for plaintiff-appellant.

M. Carr Ferguson, Asst. Atty. Gen., Tax Div., Gilbert E. Andrews, Act. Chief, Appellate Section, Richard Farber, Atty., Marilyn E. Brookens, Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before GOLDBERG, FAY and ANDERSON, Circuit Judges.

GOLDBERG, Circuit Judge:

We must today answer the riddle at once adumbrated and apparently foreclosed by the false dichotomy created by the United States Supreme Court in *Malat v. Riddell*, 383 U.S. 569, 572, 86 S.Ct. 1030, 1032, 16 L.Ed.2d 102 (1966) (per curiam): when profits have "aris[en] from the [ordinary] operation of a business" on the one hand and are *also* "the realization of appreciation in value over a substantial period of time" on the other, are these profits treated as ordinary income or capital gain? Lacking any clear guidance but the language of the capital asset statute[1] itself, we turn to that language for the answer. Before we can arrive at this interesting and important question, however, we must once again tramp along (but not trample on) that time- and precedent-worn path which separates capital gains from ordinary income. By the time we emerge into the light at the far edge of the forest, we will find that the *Riddell* riddle has seemingly answered itself, and all that will remain will be a brief reassessment of our answer. In our peregrinations, we of necessity wander into virgin territory. We hope that we shed new light onto this murky terrain; at the least, we think we have neither riddled the cases nor muddled the issues.

I.

Suburban Realty Company was formed in November, 1937 to acquire an undivided one-fourth interest in 1,742.6 acres of land located in Harris County, Texas ("the property"). Suburban received its interest[2] in the property in exchange for all of its stock from four individuals[3] who had themselves acquired the property in a foreclosure proceeding brought against the property as a result of a default in the payment of certain bonds, the payment of which was secured by the property. Suburban's corporate charter states that it was formed to erect or repair any building or improvement, and to accumulate and lend money for such purposes, and to purchase, sell, and subdivide real property, and to accumulate and lend money for that purpose.

The five transactions whose characterization is in dispute here concern six tracts of unimproved real estate sold from the property by Suburban between 1968 and 1971.[4] On its tax returns, Suburban originally reported profits from these sales, as well as

---

1. 26 U.S.C. § 1221.

2. The remaining three-fourths undivided interest was held by two individuals who acquired their interest at the same time that Suburban's shareholders acquired their interest. Mr. George Hamman owned an undivided one-half interest, which ultimately passed to the Hamman Foundation. Mrs. Mary Alice Talbot owned the remaining undivided one-fourth interest.

3. Mr. R. L. Blaffer, Mr. Joe Evans, Mr. S. P. Farish, and Mr. Will Farish.

4. The parties stipulated that the sales were as follows:

| Date | Acreage | Sales Price |
|---|---|---|
| December 31, 1968 | 4.5 | $ 56,250 |
| July 31, 1969 | 6.25 | 93,285 |
| July 31, 1969 | 6.0225 | 90,225 |
| July 31, 1969 | 17.50 | 262,282 |
| 1970 [sic] | 5.6944 | 39,799 |
| April 14, 1971 | 4.375 | 65,675 |

all of its other real estate sales, as ordinary income. Later, Suburban filed a claim for refund asserting that these six tracts, as well as three similar tracts sold later, were capital assets, and that profits from these sales were entitled to capital gain treatment. The Internal Revenue Service denied Suburban's claim as to the sales here in issue.[5] Suburban then instituted this action for a refund of $102,754.50. The district court, in a non-jury trial, rendered a decision against Suburban and entered a judgment dismissing Suburban's complaint. Suburban appealed.

The parties' legal contentions are closely bound to the facts. It is undisputed that, at the time of sale, the tracts at issue here were subject to a grass lease which apparently covered much of the property. Except for this grass lease, the six tracts, as well as much of the rest of the property, were never put to any substantial use. However, certain other portions of the property were the subject of greater activity. The parties disagree to some degree concerning the extent of, and appropriate characterization of, the activities conducted relating to these other portions of the property, and they fundamentally dispute the weight such activities carry in properly characterizing the sales at issue here. We will first discuss Suburban's overall activities with respect to the entire property, and then turn to those portions of the property singled out by the parties as being the subject of greater activity.

A. Overall activities.

1. *Total Sales Activity From the Property.*

Between 1939 and 1971, Suburban made at least 244 individual sales of real estate out of the property. Of these, approximately 95 sales were unplatted and unim-

proved property legally suitable for commercial development for any other purpose,[6] and at least 149 sales were from platted property restricted to residential development.[7] In each of these 33 years, Suburban concluded at least one sale; in most years, there were four or more sales. Suburban's total proceeds from real estate sales over this period were $2,353,935. Proceeds from all other sources of income amounted to $474,845.[8] Thus, eighty-three percent of Suburban's proceeds emanated from real estate sales; only seventeen percent flowed from all other sources.

2. *North Loop Freeway.*

In 1957, the Texas Highway Department proposed that the limited access superhighway now known as the North Loop would be located from east to west across the property. In 1959 and 1960, Suburban sold at least two parcels out of the property to the Texas Highway Department for the purpose of constructing this highway. The location of the highway had a dramatic effect on the price of land in the area. Land which had been selling for between three and five thousand dollars per acre prior to announcement of the highway rose in value to between seven and twelve thousand dollars per acre.

3. *Corporate Discussions and Investments.*

Starting not later than 1959, Suburban's officers, directors and stockholders began discussing liquidation of the corporation. Many of these discussions occurred after 1961, when Rice University became a stockholder of Suburban and the Treasurer of Rice University became a member of the board of directors. Because Rice University desired investments in income-producing

---

5. The government allowed Suburban's claim with respect to the three tracts sold later, and refunded $70,377.79.

6. There is no zoning in the City of Houston. Land use restrictions are ordinarily accomplished by placing restrictive covenants in the chain of title to the land.

7. See Appendix, *infra.*

8. This includes dividend income ($54,165), rent and lease income ($15,732), and sales of lumber from its lumber yard ($11,939). The source of the remaining proceeds, approximately $400,-000, is not apparent.

assets rather than raw land, discussions concerning liquidation [9] of Suburban's real estate holdings and the possibility of a partition of its holding among its stockholders [10] were common. Starting in 1966, Suburban made substantial investments in stocks and bonds and began receiving substantial income from these investments.

B. Specific portions.

1. *Houston Gardens.* In 1938, Suburban and the other owners of the property formed a separate corporation, Houston Gardens Annex, Inc. ("Houston Gardens"), to plat and sell a parcel in the northeast quadrant of the property. The stock ownership in Houston Gardens was in the same proportion as ownership interests in the property—i. e., Suburban and Mrs. Talbot each owned one-quarter of the stock of Houston Gardens; Mr. Hamman owned one-half of the stock. Houston Gardens owned approximately 200 or 250 lots, which were generally sold in bulk to builders. These sales covered as many as 20, 30, or even 50 lots at a time. By 1961, Houston Gardens had sold all but two of its lots, and it was then liquidated. Houston Gardens never engaged in advertising, used brokers or real estate agents, or employed a sales organization at any time during its existence.

2. *Homestead Addition.* Certain portions of the property, located near its center, were designated as Homestead Addition Sections One, Two, Three, and Four. Little was done with Homestead Addition Section One except for platting it and running a few utility lines up to it.

Homestead Addition Section Two, however, was the primary subject of Suburban's activities. In July, 1948, Suburban acquired 100 percent ownership of Homestead Addition Section Two by exchanging cash and other land for the other owners' interests. Immediately thereafter, Suburban commenced development of Homestead Addition Section Two. The area was platted, streets and sewers were put in, and a sewage disposal plant was built nearby.[11] Suburban also built a lumberyard in Section Two.[12] At the instance of one of the individuals whom Suburban hired to collect water bills and notes on houses and to manage the lumberyard, Suburban also built eleven houses in Section Two in the early 1950's. The last was built by 1955, and none was sold later than 1958.[13] Between 1948 and 1966, Suburban sold 252 subdivided lots out of Section Two. About half of these lots were sold in bulk to builders—10, 15, or 20 lots at a time.[14]

Homestead Addition Sections Three and Four were platted for residential use by Suburban in 1951. This area was never developed by Suburban, however. In 1961 the plats were withdrawn and cancelled. This had the effect of eliminating restrictions which prevented commercial use of the land. Subsequently, the real estate

---

9. Appellant uses the term "liquidation" to refer to "winding up of a corporate entity" and "conversion of assets into cash," as well as the "liquidation niche" left open by *Biedenharn Realty Co., Inc. v. United States,* 526 F.2d 409, 417 (5th Cir.) (en banc), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976).

10. This was never carried out because of the difficulty of achieving an equitable division.

11. A utility company was formed by Suburban, Mr. Hamman, and Mrs. Talbot to maintain the water and sewage system. By 1961, the system had been sold to the City of Houston, and the utility company was liquidated.

12. In 1961 or 1962, the lumberyard was sold, having already been dormant for some years.

13. The evidence conflicts concerning whether the last house was sold in 1955, 1956, or 1958. The court below implicitly found that the last house was sold in 1956. We attach no significance to the precise year in the context of this case.

14. There is no finding by the court below, or any record evidence that we can locate, concerning the number of individual transactions employed to sell the 252 lots. This lack of evidence may be attributable to Suburban's failure to record separately transactions from the various Homestead Addition Sections or even to separate Homestead Addition sales from non-Homestead sales. Alternatively, the paucity of evidence may merely reflect incompleteness of the records submitted to the district court.

within Sections Three and Four was sold to commercial and industrial users.

3. *Other Parcels.* The remainder of the property appears to have been treated as one undifferentiated bulk by Suburban. It is from this undifferentiated, undeveloped remainder that the sales at issue here were made. There are no specific findings by the trial court, and there appears to be no evidence of record from which we could ourselves make findings, concerning the number and frequency of sales of real estate from other parts of the property. Rather, the evidence concerning annual sales groups all sales made by Suburban, including sales from the Homestead Addition Sections, together.[15] However, it is clear that throughout the period 1939–1971, sales were being made from the remainder of the property.

## II.

Our analysis of this case must begin with *Biedenharn Realty Co., Inc. v. United States,* 526 F.2d 409 (5th Cir.) (en banc), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed.2d 79 (1976). *Biedenharn* is this Court's latest (and only) *en banc* pronouncement concerning the characterization of profits of a real estate business as ordinary income or capital gain. The decision answers the characterization question by evaluating certain "factors" often present in cases of this ilk.[16] *Biedenharn* attempts to guide the analysis in this area by assigning different levels of importance to various of the "factors." Substantiality and frequency of sales is called the most important factor. *Biedenharn,* 526 F.2d at 416. Improvements to the land, solicitation and advertising efforts, and brokerage activities also play an important part in the *Biedenharn* analysis.

The question before us today, put into the *Biedenharn* framework, can be stated as follows: when a taxpayer engages in frequent and substantial sales over a period of years, but undertakes no development activity with respect to parts of a parcel of land, and engages in no solicitation or advertising efforts or brokerage activities, under what circumstances is income derived from sales of undeveloped parts of the parcel ordinary income?

The *Biedenharn* framework allows us to ask the question, but gives us little guidance in answering it. In the principal recent cases, there has always been a conjunction of frequent and substantial sales with development activity relating to the properties in dispute. *See, e. g., Houston Endowment, Inc. v. United States,* 606 F.2d 77, 82 (5th Cir. 1979), *Biedenharn,* 526 F.2d at 417; *United States v. Winthrop,* 417 F.2d 905, 911 (5th Cir. 1969). The conjunction of these two factors "will usually conclude the capital gains issue against [the] taxpayer." *Biedenharn,* 526 F.2d at 418. Judge Wisdom has recently written that "ordinary income tax rates usually apply when dispositions of subdivided property over a period of time are continuous and substantial rather than few and isolated." *Houston Endowment,* 606 F.2d at 81. Also, it has been explicitly stated that the factor which will receive greatest emphasis is frequency and substantiality of sales over an extended time period. *See Biedenharn,* 526 F.2d at 417. However, substantial and frequent sales activity, standing alone, has never been held to be automatically sufficient to trigger ordinary income · treatment. In fact, we have continual reminders of the fact that "specific factors, or combinations of them are not necessarily controlling," *Biedenharn,* 526 F.2d at 415, *quoting Thompson v. Commissioner,* 322 F.2d 122,

15. See n. 14, *supra.*

16. In the *United States v. Winthrop,* 417 F.2d 905, 910 (5th Cir. 1969), the following factors were enumerated:
 (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales.

127 (5th Cir. 1963), *quoting Wood v. Commissioner,* 276 F.2d 586, 590 (5th Cir. 1960).

Each of the parties invites us to look back to a case from long ago for guidance. Suburban points to *Alabama Mineral Land Co. v. Commissioner,* 250 F.2d 870 (5th Cir. 1957). The Government points to *Thompson, supra.* Each claims that the case it cites is substantially identical on its facts to the one before us. Each is essentially correct.[17] However, we again decline, as have the earlier cases, to attempt a case-by-case distinction. *See Houston Endowment,* 606 F.2d at 82, *Biedenharn,* 526 F.2d at 421; *Thompson,* 322 F.2d at 127. We merely note that the *Alabama Mineral* decision contains no analysis of whether "the antiquated purpose" (liquidation of property holdings) was "overborne by later, but substantial and frequent selling activity." *Biedenharn,* 526 F.2d at 421. Rather, the court simply characterized taxpayer's purpose for acquiring the property as "liquidation," and concluded that sales made in liquidation result in capital gain rather than ordinary income. *Alabama Mineral,* 250 F.2d at 872. *Biedenharn* tells us, however, that "investment purpose has no built-in perpetuity nor a guarantee of capital gains forever more [*sic*]." 526 F.2d at 421. Thus, the method of analysis used in *Alabama Mineral* has not survived *Biedenharn.*[18]

Today, we must go into territory as yet unmapped in this Circuit. Suburban's case is at once more favorable to the taxpayer than Biedenharn's and less so. It is more favorable because, *with respect to the particular parcels of land here at issue,* it is undisputed that Suburban undertook no development or subdivision activity. It is less favorable because Biedenharn was continually engaged in business activities other than real estate sales, whereas Suburban

was for many years doing little else. Following the *Biedenharn* framework alone, we would be left with yet another essentially *ad hoc* decision to be made. We could justify a decision for either party, yet remain confident that we were being fully consistent with the analysis in *Biedenharn.* However, although there will always remain a certain irreducible *ad hoc*-ishness in this area, we are now firmly convinced that the uncertainty can be substantially reduced by turning to the divining rod of capital gains versus ordinary income—the statute itself.

### III.

The jurisprudence of the "real estate capital gains-ordinary income issue" in this Circuit has at times been cast somewhat loose of its statutory mooring. The ultimate inquiry in cases of this nature is whether the property at issue was "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C.A. § 1221(1) (West 1967). In our focus on the "tests" developed to resolve this question, we have on occasion almost lost sight entirely of the statutory framework. The "tests" or "factors," whether they be counted to number seven, *see Winthrop,* 417 F.2d at 910, or to number four, *see Houston Endowment,* 606 F.2d at 81, have seemingly acquired an independent meaning of their own, only loosely tied to their statutory pier. Some years ago, Judge Brown cautioned us against this tendency:

> Essential as they are in the adjudication of cases, we must take guard lest we be so carried away by the proliferation of tests that we forget that the statute excludes from capital assets 'property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.'

---

17. Were the presence of subdivision and development activity the critical fact mandating ordinary income treatment in these cases, Suburban's analogy of the instant case to *Alabama Mineral* would be closer than the Government's analogy to *Thompson.* However, such a presumption assumes the answer to the question before us: whether subdivision and develop-
ment activity is a *sine qua non* of ordinary income treatment.

18. We also note that *Alabama Mineral* is not cited in the *Biedenharn* decision in its listing of earlier decisions which the *Biedenharn* court was "loath to overrule." *Biedenharn,* 526 F.2d at 421.

*Thompson*, 322 F.2d at 127. *See Biedenharn*, 526 F.2d at 424 (Roney, J., specially concurring).

■ The tendency to overemphasize the independent meaning of the "factors" has been accompanied by, perhaps even caused by, a tendency to view the statutory language as posing only one question: whether the property was held by the taxpayer "primarily for sale to customers in the ordinary course of his trade or business." This determination was correctly seen as equivalent to the question whether the gain was to be treated as ordinary or capital. However, probably because the question "is the gain ordinary" is a single question which demands an answer of yes or no, the courts have on occasion lost sight of the fact that the statutory language requires the court to make not one determination, but several separate determinations. In statutory construction cases, our most important task is to ask the proper questions. In the context of cases like the one before us, the principal inquiries demanded by the statute are:

1) was taxpayer engaged in a trade or business, and, if so, what business?

2) was taxpayer holding the property primarily for sale in that business?

3) were the sales contemplated by taxpayer "ordinary" in the course of that business? [19]

We by no means intend to suggest that we disagree with anything decided by the recent Fifth Circuit decisions. *Biedenharn* guides our decision-making process. But after the relevant three independent statutory inquiries are pried apart, it becomes apparent that the central dispute in *Biedenharn* was a narrow one: was Biedenharn Realty Company holding the land in dispute "primarily for sale?" The majority, applying the *Winthrop* factors, decided this question in the affirmative. The dissent, emphasizing the continuing farming activities being conducted by Biedenharn, *see Biedenharn*, 526 F.2d at 425 & n.5, 426 (dissenting opinion), disagreed as to this conclusion.[20]

■ In fact, once the inquiry is redirected towards the statutory inquiries, the ultimate relevance of the *Biedenharn* factors becomes apparent. It will remain true that the frequency and substantiality of sales will be the most important factor. But the reason for the importance of this factor is now clear: the presence of frequent and substantial sales is highly relevant to each of the principal statutory inquiries listed above.[21] A taxpayer who engages in frequent and substantial sales is almost inevitably engaged in the real estate business. The frequency and substantiality of sales are highly probative on the issue of holding purpose because the presence of frequent sales ordinarily belies the contention that property is being held "for investment" rather than "for sale." And the frequency of sales may often be a key factor in determining the "ordinariness" question.

■ The extent of development activity and improvements is highly relevant to the question of whether taxpayer is a real estate developer. Development activity and improvements may also be relevant to the taxpayer's holding purpose, but, standing alone, some degree of development activity

---

**19.** In other types of cases, or even in real estate cases with different factual patterns, other questions may be crucial. For example, whether the contemplated purchasers were "customers" of the taxpayers, or whether business activity is to be imputed to taxpayer so as to be considered "taxpayer's business," could be an important inquiry. Yet other inquiries may be demanded by the statutory language in other contexts. Here, the key questions are those set out above.

**20.** It is also possible that the dissenters would have concluded that Biedenharn was not in the real estate business. *See Biedenharn*, 526 F.2d at 427 (dissenting opinion). However, the three inquiries identified today were not focused on separately by either the majority or the dissent. *Cf. Biedenharn*, 526 F.2d at 424 (concurring opinion of Roney, J.) (suggesting at least two inquiries mandated by statute).

**21.** This truth is suggested in *Biedenharn*:

The frequency and substantiality of Biedenharn's sales go not only to its holding purpose and the existence of a trade or business but also support our finding of the ordinariness with which the Realty Company disposed of its lots.

526 F.2d at 416.

is not inconsistent with holding property for purposes other than sale.[22] The extent of development activity also seems to be only peripherally relevant to the "ordinariness" question.[23] Thus, under the statutory framework, as under *Biedenharn*, the extent of development activity and improvements, although an important factor, is less conclusive than the substantiality and frequency of sales.

■ Solicitation and advertising efforts are quite relevant both to the existence of a trade or business and to taxpayer's holding purpose. Thus, their presence can strengthen the case for ordinary income treatment.

*See Biedenharn*, 526 F.2d at 418. However, in cases like *Biedenharn*, their absence is not conclusive on either of these statutory questions for, as we noted there, "even one inarguably in the real estate business need not engage in promotional exertions in the face of a favorable market." *Id.*

We need not comment individually on each of the other *Biedenharn-Winthrop* factors. It should be apparent that each factor is relevant, to a greater or lesser extent, to one or more of the questions posed by the statute along the path to the ultimate conclusion.[24]

---

22. For example, a taxpayer might clear trees and conduct some grading and filling activities in preparation for farming the land.

23. We here must caution that we of course cannot contemplate all possible fact situations, and our suggestions concerning which factors are relevant to which questions may not be applicable to all fact patterns. The discussion here is intended merely to demonstrate the close relationship between the requisite statutory determinations and the *Biedenharn* factors.

24. We will here attempt to clear up some of the confusion relating to the relevance of the percentage of taxpayer's average annual income attributable to real estate sales. This percentage has often been mentioned in the real estate cases; its significance has never been clear. *See, e. g. Houston Endowment*, 606 F.2d at 81 n.3; *Biedenharn*, 526 F.2d at 419; *id.* at 426 & n.7 (dissenting opinion); *Winthrop*, 417 F.2d at 907. Rather, these decisions have referred to the percentage, often compared it to the comparable percentage in another case, and perhaps noted that the percentage in the case being decided was like or unlike the percentage in another case. Once the percentage is related to the statutory inquiries, it can easily be seen that the percentage may or may not be relevant depending on the facts of the case and the taxpayer's claims. Two examples are appropriate here.

First, a taxpayer who has made only a few sales involving fairly modest dollar amounts may argue that he is not in the real estate business. The taxpayer's claim to capital gain treatment is likely to be weaker if he can point to no other business activities; i. e., if close to 100 percent of his income is derived from sales of real estate. Conversely, if the taxpayer is also engaged in extensive activities other than real estate sales, the presence of another trade or business may make it less likely that he will be found to be in the real estate business. However, frequent real estate sales activity substantial in dollar amount will likely conclude the "trade or business" question against taxpayer. He will be held to be engaged in both the real estate business and his other business. *See Biedenharn*, 526 F.2d at 419 & n.35.

The taxpayer's next argument will likely be that the property is held "primarily" for use in his other business (e. g., farming) rather than "for sale." If a large percentage of his income *derived from the land in dispute* is earned other than by sale, his claim that his primary holding purpose is for use in his other business is buttressed. This would clearly be the case if a few small tracts of land were sold from a large active farm. Conversely, if most of the income derived from the land in dispute is earned from real estate sales, it is more likely that the taxpayer's primary holding purpose is "for sale."

In *Biedenharn*, the percentage offered was real estate sales as compared to total income. The fact that this percentage was low (11.1%), *see* 526 F.2d at 419, demonstrated that Biedenharn was engaged in businesses other than real estate (e. g., securities investments). These other businesses did not relate to the property in dispute. Thus, the percentage offered was not relevant to Biedenharn's holding purpose. The relevant percentage would have been real estate sales profits compared to total income from the land (which would include, e. g., income from farming or leasing the land).

A second situation in which a percentage is relevant involves a taxpayer attempting to demonstrate that certain parcels of land were held for purposes other than for sale. This taxpayer could concede that he was in the real estate development business, but would argue that certain specific parcels of land were not held "primarily for sale." *See, e. g., Wood v. Commissioner*, 276 F.2d 586 (5th Cir. 1960); *Maddux Construction Co.*, 54 T.C. 1278 (1970); *Randolph D. Rouse*, 39 T.C. 70 (1962); *Nelson A. Farry*, 13 T.C. 8 (1949). These specific properties, he would argue, were held for other

## IV.

Having laid the framework for the requisite analysis, we must now apply that framework to the facts here. We must decide whether Suburban was engaged in a trade or business, and, if so, what business; whether Suburban was holding the properties at issue here primarily for sale; and whether Suburban's contemplated sales were "ordinary" in the course of Suburban's business.

Before we commence this analysis, we must ascertain the appropriate standard of appellate review. Unfortunately, the hidden supposition that the statutory language poses only one question, *see* p. 178 *supra*, has caused great confusion[25] concerning whether the appropriate standard is "clearly erroneous" or "plenary review." This Circuit has often faced the question whether the characterization of property as "primarily held for sale to customers in the ordinary course of [taxpayer's] trade or business" is a question of law or a question of fact. This characterization is of course crucial to the outcome of many cases—if the characterization is a question of fact, the factfinder's answer must be accepted unless clearly erroneous, but, if a question of law is presented, plenary review on appeal is appropriate. Unfortunately, there are two independent lines of authority in this Circuit on this issue. One line has its genesis in *Galena Oaks Corporation v. Scofield*, 218 F.2d 217 (5th Cir. 1954), and holds that the characterization "is in-

herently a question of law." *United States v. Winthrop,* 417 F.2d 905, 910 (5th Cir. 1969).[26] The other line traces its roots to *Thompson v. Commissioner,* 322 F.2d 122, 127 (5th Cir. 1963), and can be followed through *United States v. Temple,* 355 F.2d 67, 68 (5th Cir. 1966) to *United States v. Burket,* 402 F.2d 426, 429 (5th Cir. 1968) and *Huxford v. United States,* 441 F.2d 1371, 1375 (5th Cir. 1971). This line holds that "the question of whether certain properties were held by a taxpayer 'primarily for sale to customers in the ordinary course of [his] trade or business' is essentially a question of fact." *Burket,* 402 F.2d at 429. *See Commissioner v. Tri-S Corp.,* 400 F.2d 862, 864 (10th Cir. 1968) (question is "essentially a question of fact"); *Maddux Construction Co.,* 54 T.C. 1278, 1284 (1970) ("question is purely a factual question").

We need not here psychoanalyze the nightmares of characterization that have fascinated professors of civil procedure: the distinctions between historical, evidentiary, subsidiary, and ultimate facts are too fine for useful discussion. Once it is perceived that the ultimate legal conclusion of capital gain or ordinary income involves several independent determinations, it can be easily seen that some of the determinations are predominantly legal conclusions or are "mixed questions of fact and law," whereas others are essentially[27] questions of fact. Thus, the question of taxpayer's purpose or purposes for holding the proper-

purposes. In this situation, a relevant percentage would be profits from (or number of) sales from property held primarily for sale as compared to profits from (or number of) all sales. If many of taxpayer's sales, or much of his profit, emanated from properties he claimed to hold for purposes other than "for sale," the taxpayer would be highly unlikely to establish capital gain treatment. Conversely, if a taxpayer who engaged in a high volume subdivision business sold one clearly segregated tract in bulk, he might well prevail in his claim to capital gain treatment on the segregated tract.

**25.** An early example is presented by *Thomas v. Commissioner,* 254 F.2d 233 (5th Cir. 1958), in which the court first carefully removed its review of the Tax Court's legal conclusion from the constraints of the "clearly erroneous" rule, *see id.* at 236, and then proceeded to find the

Tax Court's determination that the property was held primarily for sale to customers in the ordinary course of his trade or business to be "clearly erroneous." *Id.* at 237. For another early example, see *Smith v. Commissioner,* 232 F.2d 142 (5th Cir. 1956).

**26.** This line includes, *inter alia, Houston Endowment, Inc. v. United States,* 606 F.2d 77, 83 (5th Cir. 1979); *Biedenharn,* 526 F.2d at 416 n.25; *Winthrop;* and *Thomas v. Commissioner,* 254 F.2d 233, 236 (5th Cir. 1958).

**27.** None of the determinations appears to be a "pure" question of fact because findings such as "holding purpose" and "ordinariness" necessarily involve application of precedent to determine the import of these terms.

ty is primarily factual, as is the question of which purpose predominates. Similarly, the "ordinariness" of the contemplated sales is mainly a fact question. The question of whether taxpayer was engaged in a trade or business involves the application of legal standards concerning what constitutes a trade or business to the facts concerning taxpayer's activities, and therefore is best characterized as a "mixed question of fact and law", The ultimate legal conclusion, based on these factual and legal conclusions, of whether the property was "held primarily for sale to customers in the ordinary course of his trade or business" cannot be appropriately characterized in this scheme at all because, as noted above, there are several subsidiary questions which, separately answered, lead to the ultimate conclusion.[28]

### A. Was Suburban in the real estate business?

This is a relatively simple issue. The question is whether taxpayer has engaged in a sufficient quantum of focused activity to be considered to be engaged in a trade or business. The precise quantum necessary will be difficult to establish, and cases close to the line on this issue will arise.

 Happily, we need not here define that line. It is clear to us that Suburban engaged in a sufficient quantity of activity to be in the business of selling real estate. Suburban's sales were continuous and substantial. It completed at least 244 sales

transactions over the 33-year period 1939–1971. This averages to over 7 transactions per year. Proceeds from these sales exceeded 2.3 million dollars.

Suburban does not claim to have been engaged in any business other than real estate; rather, it claims that during the periods at issue it simply "did not carry on a trade or business." Br. for Appellee at 20. Were additional support necessary for our conclusion, we would point to Suburban's own statements on its tax returns over the years that its principal business activity was "development and sales of real estate." These statements are by no means conclusive of the issue. *See Thomas v. Commissioner*, 254 F.2d 233, 236–37 (5th Cir. 1958). However, we believe they show at least that if Suburban is engaged in a trade or business, that business is real estate.[29] And Suburban's activities over the years were sufficient to convince us that it cannot sustain its contention that it was never engaged in any "trade or business" at all.

Suburban relies heavily on the insignificance of its subdivision and development activity and the total absence of any advertising or sales solicitation activity on its part. However, the first two absences do not concern us at all. We need not decide whether its subdivision and development activities were sufficient to compel the conclusion that Suburban was in the real estate development business.[30] We rely solely on Suburban's real estate sales business.

---

**28.** It should be apparent that appellate review of a trial court's application of the answers to the subsidiary questions to arrive at the ultimate conclusion is plenary.

**29.** In *Thomas*, we went to some length to demonstrate that the fact that Thomas designated his occupation as a Real Estate Broker and as a Registered Real Estate Broker was not conclusive in determining the character of the holding of property of the taxpayer sold by him. *See Thomas*, 254 F.2d at 236–37. Thomas did earn brokerage commissions on sales of certain properties where his role was that of a middleman or go-between; i.e., a broker. This fact, we said, was not of great significance in determining whether dealings in property owned by the taxpayer were to be characterized as investments or as "sale[s] to customers in the

ordinary course of [his] trade or business." Put otherwise, it might be said that an admission that one is a real estate "broker" does not automatically concede that one is also a "dealer" in real estate. Thomas was a real estate broker, but as to deals in which he was a principal, he successfully argued that he was an investor rather than a dealer.

Here, Suburban's argument is of an entirely different character. Suburban suggests no business other than real estate dealing, but claims that it was engaged in no business at all.

**30.** If Suburban was ever in this business, it certainly had withdrawn by 1961, when the plats for Homestead Addition Two were withdrawn and cancelled, as no development activity had occurred since 1955.

■ The presence of any sales solicitation or advertising activity would certainly be relevant to the issue of whether Suburban was in the business of selling real estate. Strenuous, but largely unsuccessful, attempts to sell might compel the conclusion that a taxpayer with very few sales transactions was nonetheless in the business of selling. But the absence of such activity does not compel the opposite conclusion. *See* p. 179, *supra; Thompson*, 322 F.2d at 126.

■ Suburban also seeks solace from the fact that it never purchased any additional real estate to replenish acreage it sold. As is the case with the presence of sales activity, the presence of such purchases tends to demonstrate that a taxpayer is engaged in a real estate business, but their absence is not conclusive:

> The fact that [taxpayer] bought no additional lands during this period does not prevent his activity being a business. [Taxpayer] merely had enough land to do a large business without buying any more.

*Biedenharn*, 526 F.2d at 417, *quoting Snell v. Commissioner*, 92 F.2d 891 (5th Cir. 1938).

■ Additionally, Suburban points to its commencement of an investment program in securities in 1966. By itself, this cannot affect our conclusion that Suburban was in the real estate business. It merely demonstrates that, commencing in 1966, Suburban was also engaged in investing in securities.[31] As stated earlier, the presence of other types of activities does not prevent taxpayer's real estate activities from being considered a business.[32]

Suburban also contends that, if it was ever in the real estate business, it had exited that business long before 1968, the time of the first transaction here at issue. Even if this is true, it cannot affect our ultimate conclusion. The statutory language does not demand that property actually be sold while a taxpayer is still actively engaged in its trade or business for ordinary income treatment to be required. Rather, it demands that the property have been held primarily for sale in that business.[33] To that inquiry we now turn.

B. What was Suburban's primary purpose for holding the properties whose characterization is here in dispute?

Put into the framework being used here, Suburban's contention concerning holding purpose is two-fold. Principally, it argues that, at the time of the sales in dispute, the properties were not being held for sale. Alternatively, it contends that it "originally acquired its property as an investment . . . , and it continued to hold it for investment purposes." Br. for Appellant at 7.

■ We reject Suburban's statement of the legal principle upon which its first argument is premised. It simply cannot be true that "the decisive question is the purpose for which [the property] 'primarily' was held when sold." Br. for Appellant at 15 (emphasis omitted).[34] At the very moment of sale, the property is certainly being held "for sale." The appropriate question certainly must be the taxpayer's primary holding purpose at some point before he decided to make the sale in dispute.

There is language in the cases that supports the proposition we are here rejecting. For example, the Tax Court has stated explicitly that "the determining factor is the purpose for which the property is held at the time of sale." *Eline Realty Co.*, 35 T.C. 1, 5 (1960). *See Maddux Construction Co.*, 54 T.C. 1278, 1286 (1970).

---

**31.** We need not here reach the question of under what circumstances, if any, such investment activities would be considered a "trade or business."

**32.** See n. 24, *supra*

**33.** The question of exit from a business is intimately tied to, although independent of, the "holding purpose" inquiry. Exit from active business can be strong evidence of a change in holding purpose. The holding purpose question, as well as the timing of its inquiry, are discussed immediately below.

**34.** We note that the Government also adopts this position. Br. for Appellee at 45.

However, neither party has cited any Supreme Court or Fifth Circuit precedent which states the proposition that the relevant holding purpose is that existing at the moment of sale. Suburban relies on *Malat v. Riddell*, 389 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966) and *Fahs v. Crawford*, 161 F.2d 315 (5th Cir. 1947). *Malat* does not address this issue at all, but concerns the meaning of the word "primarily" in 26 U.S.C. § 1221(1). *See* 389 U.S. at 571–572, 86 S.Ct. at 1032. *Fahs* merely acknowledges the possibility that a taxpayer's holding purpose for an asset may change, *see* 161 F.2d at 317, a concept we wholeheartedly approve. The Government points to *Ridgewood Land Co., Inc. v. Commissioner*, 477 F.2d 135 (5th Cir. 1973) (per curiam). There, as in *Fahs*, we see no more than a holding that a taxpayer's purpose for holding an asset may change, so that his intentions at the time of acquisition of the asset do not control the characterization of the proceeds of its sale. *See* 477 F.2d at 136.[35]

Actually, although we are exceedingly hesitant to tell other courts that they do not mean precisely what they have said, the Tax Court cases cited above are not inconsistent with our approach. In *Eline Realty, supra*, the court found that taxpayer's holding purpose for the particular parcel at issue changed "from one of sale to one of investment" long before the parcel was sold. *Id.*, 35 T.C. at 6. Similarly, *Maddux Construction, supra*, stands for the proposition that a taxpayer can abandon prior to sale his initial purpose for acquiring the property. *Id.*, 54 T.C. at 1286.

The "holding purpose" inquiry may appropriately be conducted by attempting to trace the taxpayer's primary holding purpose over the entire course of his ownership of the property. *See Malat v. Riddell*, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966); *Devine v. Commissioner*, 558 F.2d 807 (5th Cir. 1977).[36] Thus, the inquiry

---

**35.** Suburban also cites *Commissioner v. Tri-S Corp.*, 400 F.2d 862 (10th Cir. 1968), in support of its contention. *Tri-S* adopts our approach to this problem. The taxpayer there purchased land on October 10, 1960 and sold it on October 6, 1961. The court found that prior to April 7, 1961, the taxpayer had intended to improve the land. On that date, the State of Colorado notified the taxpayer that part of the land would be condemned. From April 7, the court found, the taxpayer was not holding the land primarily for sale to customers in the ordinary course of its trade or business. Thus, it was not holding the land for sale to customers in the ordinary course of its trade or business on July 25, 1961, when it agreed to sell the land, or October 6, 1961, the date of the conveyance.

We caution that our agreement with the Tenth Circuit on the question of the timing of the holding purpose inquiry should not be understood to indicate our agreement with its ultimate conclusion. If external events change the holding purpose for certain property from "for sale" to "for investment," we might well still find that the gains were ordinary because the property had been acquired and held "primarily for sale to customers in the ordinary course of [taxpayer's] trade or business." Conversely, as indicated in *Biedenharn*, an initial purpose to hold for investment might "endure[ ]" in controlling fashion notwithstanding continuing sales activity." *Biedenharn*, 526 F.2d at 421. As noted there, such an opening would most generally exist "where the change from investment holding to sales activity results from unanticipated, externally induced factors

which make impossible the continued pre-existing use of the realty." *Id.* On the facts of *Tri-S*, we might well have concluded that taxpayer was "wholesaling" property held "primarily for sale to customers in the ordinary course of his trade or business," so that ordinary income treatment would be appropriate. This "wholesaling niche" would be the converse of the "liquidation niche" left open by *Biedenharn*.

**36.** It is not clear to us from the *Malat* decision whether "primarily" means "predominates at a certain point of time" or "predominates over the life of taxpayer's ownership of the asset." This could be critical if, for example, a taxpayer held a piece of property primarily for sale over many years, but then, shortly but not immediately before sale, switched his primary holding purpose to one of investment. If the appropriate measure of "primarily" is at a fixed instant of time, this taxpayer would be entitled to capital gain treatment if the other requirements of § 1221 are met. However, taxpayer's "primary holding purpose" over the length of his ownership of the asset would still be "for sale," and, if this is the proper test, ordinary income treatment would be mandated.

We express no opinion on the resolution of this issue, for it is unnecessary to our decision. We find Suburban's primary holding purpose to be "for sale" both at the relevant moment of time, if the first proposed test is appropriate, and over most of the period of Suburban's ownership of the property, if the second pro-

should start at the time the property is acquired. We seek to divine the taxpayer's primary purpose for acquiring the property. In this case, we are willing to assume, as Suburban argues, that the property was acquired principally as an investment.[37] We then seek evidence of a change in taxpayer's primary holding purpose. Here, such evidence is plentiful and convincing.

The property was acquired in December, 1937. Houston Gardens Annex, Inc. was formed in 1938 to plat and sell a portion of the property. Sales commenced by 1939, and sales were transacted in each year thereafter. From 1946 through 1956, approximately 17 sales per year occurred. Proceeds from sales exceeded $8,500 each year, and were as high as $69,000 (in 1952). Also during this period, the development activity pertaining to Homestead Addition Two was occurring. *See* pp. 175–176, *supra.* This development activity clearly contemplated, and was accompanied by, sales.

All of these factors convince us that, by the mid-1940's at the latest, and probably much earlier, Suburban's primary holding purpose was "for sale." We need not decide the precise moment. Were it necessary

to our decision, we quite likely would be unwilling to accept Suburban's contention that the property was initially acquired for investment. *See* n.37, *supra.*

With its primary holding purpose through the 1940's and 1950's fixed at "for sale," Suburban is then entitled to show that its primary purpose changed to, or back to, "for investment." Suburban claims that this shift occurred either in 1959, when its officers and directors discussed liquidation; in 1961, when Rice University became a stockholder of Suburban, further liquidation discussions were held, and the plats were withdrawn; or, at the latest, in 1966, when further liquidation discussions were held and Suburban began investing in securities.

We view this determination to be a closer call than any of the others in this case. The frequency of sales did drop off after the late 1950's. Suburban had discontinued its development activities.[38] Also, 1961 was the year the plats for Homestead Additions Three and Four were withdrawn.

This withdrawal of plats could be quite significant. Unlike liquidation discussions,[39] which were apparently a dime a

posed test is appropriate. *See* ensuing discussion in text.

**37.** There is considerable evidence to the contrary. Suburban's corporate charter clearly contemplates an active real estate business rather than passive investment status. This is not conclusive, because "the exercise of a [corporate] power and not the possession of it is the material factor to be weighed in testing whether a corporation is in a particular business." *Alabama Mineral, supra,* 250 F.2d at 872. More importantly, Suburban's activities, commencing soon after acquisition of the property, are convincing evidence that it did not originally acquire the property primarily for investment. Thus, the same facts which convince us that any initial investment holding purpose was soon overborne by Suburban's desire to sell, *see* discussion in text, also make us highly skeptical of Suburban's claim to have initially intended to hold the property primarily for capital appreciation. The trial court adopted this theory, stating "the pattern of [Suburban's] acquisition and subsequent activities indicates that the plaintiff never had any other idea than to periodically sell the property to its customers." In future cases, we would expect

such fact findings to be followed unless clearly erroneous. We are reluctant to follow that course here because of the extreme confusion the cases have previously exhibited concerning what is fact and what is law in this area. *See* pp. 180–181, *supra.*

**38.** These two factors are probative of a changed holding purpose, as they tend to demonstrate a different corporate attitude towards the real estate. They are not conclusive of this issue, however. *See* pp. 178–179, *supra,* and nn. 40 & 42, *infra.*

**39.** We attach no independent significance to "liquidation discussions." As we said in *Biedenharn,* "a taxpayer's claim that he is liquidating a prior investment does not really present a separate theory but rather restates the main question . . . under scrutiny." *Biedenharn,* 526 F.2d at 417.

As noted *supra* n. 9, Suburban uses the term "liquidation" to refer to discussions about winding up Suburban as a corporate entity and distributing its assets, as well as discussions about converting its investments into cash. Discussions about each of these matters may

dozen for Suburban, withdrawal of the plats was an action taken by Suburban which may evince a different relationship to its land. The critical question is whether this withdrawal indicated that henceforth the land was being held principally as an investment or simply showed that Suburban was attempting to maximize sales profits by selling to commercial users.

█ The continuing sales activity is strong evidence that the latter interpretation is the correct one.[40] Moreover, the trial court found that the withdrawal evinced "an attempt to maximize profits from the sale of real estate and to capitalize on the new North Loop Freeway which would cross [Suburban's] property."[41] Thus, we conclude that Suburban's primary purpose for holding the property remained "for sale" at the time of the transactions here disputed.[42]

Suburban does not explicitly contend that its primary purpose for holding the specific parcels at issue here was different from its purpose for holding the property as a whole. However, it does attempt to rely to some degree on the lack of development activity relating to the parcels here at issue. Although in some circumstances a taxpayer in the real estate business may be able to establish that certain parcels were held primarily for investment, *see* n.24, *supra* and

cases cited, the burden is on the taxpayer to establish that the parcels held primarily for investment were segregated from other properties held primarily for sale. The mere lack of development activity with respect to parts of a large property does not sufficiently separate those parts from the whole to meet the taxpayer's burden. *Cf. Houston Endowment*, 606 F.2d at 81 (pattern of sales activity with respect to entire tract determines characterization of individual sales). The lack of development activity with respect to the parts of the property here at issue is at least equally consistent with a primary motivation to maximize immediate sales profits as it is with a primary motivation to hold for investment.

C. Were the sales contemplated by Suburban "ordinary" in the course of Suburban's business?

█ We need say no more on this question than quote from the discussion of this issue in *Winthrop, supra*:

The concept of normalcy requires for its application a chronology and a history to determine if the sales of lots to customers were the usual or a departure from the norm. History and chronology here combine to demonstrate that [taxpayer] did not sell his lots as an abnormal or unex-

evidence a change in holding purpose, but a corporation's actions may speak louder than "its" words. The latter is the case here. When investigating a corporation's intent, courts must be skeptical of words spoken at board meetings.

Although Suburban uses the word "liquidation" in an effort to place itself in *Biedenharn's* "liquidation niche," *Biedenharn*, 526 F.2d at 417, that concept is not applicable here. Rather, it refers to the possibility that a holding purpose other than "for sale" might be found to continue through a period of relatively substantial sales activity when "unanticipated, externally induced factors . . . make impossible the continued pre-existing use of the realty." *Id.* at 421.

**40.** The average number of annual sales over the period 1961–1971 remained in excess of three.

**41.** Like Suburban's initial primary holding purpose, its primary holding purpose at this time is an issue of fact on which the trial court's find-

ings must be accepted unless clearly erroneous. We have undertaken a somewhat stricter review because of the confusion noted above. *See* pp. 180–181 and n. 37, *supra*.

**42.** Some of our skepticism over Suburban's claim to have changed its holding purpose stems from the fact that it points to so many separate times when its purpose may have changed. This leads us to believe that Suburban was merely gradually shifting its strategies as market conditions changed in an effort to maximize sales profits. We do not reject outright the possibility that a sequence of events separate in time may indicate a gradual change in holding purpose from "for sale" to "for investment." However, we would be more likely to find a "change of purpose" argument convincing if a discrete event were followed by a string of zero's in the annual sales column figures, especially if this were followed by a sale of the remainder of taxpayer's property in a small number of transactions.

pected event. [Taxpayer] began selling shortly after he acquired the land; he never used the land for any other purpose; and he continued this course of conduct over a number of years. Thus, the sales were . . . ordinary.

417 F.2d at 912. The same is true here.

## V.

Having relied on the language of § 1221 itself to determine that the assets here at issue were not capital assets, we must return for a moment to the query posed at the outset. In this case, as we have demonstrated, sales of the type here in dispute were precisely what Suburban's business was directed towards. In other words, the profits garnered from these sales arose from the ordinary operation of Suburban's business.

At the same time, however, these profits did not arise principally from the efforts of Suburban. Rather, they arose from the same historical, demographic, and market forces that have caused the City of Houston to grow enormously during the years Suburban held the land. Shrewdly, Suburban held on to much of its land. It only sold relatively small portions year by year. Thus, by 1968, market forces and the location of the North Loop Freeway had driven up the value of Suburban's land.[43] We must decide whether the policies motivating lower tax rates on capital gains and the controlling precedents expressing those policies require that we ignore the plain language of § 1221 and hold for Suburban.

The key cases we must explore here number three. First is *Malat v. Riddell*, 389 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966) (per curiam). It lends us no aid. As we have previously stated,[44] it suggests that profits cannot arise from both "the [ordinary] operation of a business" and "appreci-

ation in value accrued over a substantial period of time." Yet here we have profits which fall squarely into both categories.

We thus turn to the two cases from which the *Malat* court quotations are taken, *Commissioner v. Gillette Motor Transport, Inc.*, 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960), and *Corn Products Refining Company v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955). In *Gillette*, the Supreme Court said:

This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation and the entire gain in one year.

364 U.S. at 134, 80 S.Ct. at 1500. We note that the quoted language does not state that all gains emanating from appreciation in value over a substantial period of time are to be treated as capital gains. Rather, it states the logical converse of that proposition; *i. e.*, that capital gain treatment will be proper only if the gain emanates from appreciation in value. Instances of gain emanating from appreciation being treated as ordinary income are not inconsistent with this proposition.

We also note the Supreme Court's recognition of the attempt by Congress to avoid taxing income earned over a period of years in one year. In Suburban's case, although it is true that with respect to each individual parcel of land there is a "bunching" effect, taxation of the overall gains from the property as a whole has been spread over a long period of years. Thus, the "bunching" effect has been minimized. Last, we note the Supreme Court's admonition to construe the term "capital asset" narrowly. *Id.*

**43.** Suburban's evidence demonstrated that the normal net profit on sales by a developer is approximately thirty-three percent, whereas Suburban's profit on the sales here in issue approximated ninety-five percent. Since Suburban did nothing to enhance the value of the parcels here at issue, and since we can take notice of the often rapid rise in real estate

prices as cities expand, we accept Suburban's contention that its profits on these sales emanated from market forces and Suburban's patience rather than any other value-enhancing activities performed by Suburban.

**44.** *See* p. 173 *supra.*

Further support for a narrow construction of the term "capital asset" and a broad interpretation of its exclusions comes from *Corn Products*, the third key case in this area. *See Corn Products*, 76 S.Ct. at 24. More importantly, the Supreme Court in *Corn Products* squarely stated:

> Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss.

*Id.* It is this type of profit that is before us today.

We thus conclude that § 1221(1) should be construed in accord with its plain meaning, and that, if the other requirements of § 1221(1) are met, when the ordinary business of a business is to make profits from appreciation in value caused by market forces, those profits are to be treated as ordinary income. Such is the case here.

## VI.

Our journey over, we have nothing more to add. The decision of the district court dismissing Suburban's complaint is AFFIRMED.

## APPENDIX

| Date | Number Commercial Sales | Number Residential Sales | Total Number Sales |
|---|---|---|---|
| 1939 | 4 | 0 | 4 |
| 1940 | 3 | ?* | 3 + * |
| 1941 | 1 | ? | 1 + |
| 1942 | 2 | ? | 2 + |
| 1943 | 1 | ? | 1 + |
| 1944 | 3 | ? | 3 + |
| 1945 | 5 | ? | 5 + |
| 1946 | 11 | 6 | 17 |
| 1947 | 3 | 12 | 15 |
| 1948 | 0 | 21 | 21 |
| 1949 | 3 | 6 | 9 |
| 1950 | 6 | 46 | 52 |
| 1951 | 1 | 6 | 7 |
| 1952 | 4 | 14 | 18 |
| 1953 | 2 | 6 | 8 |
| 1954 | 0 | 5 | 5 |

\* Records incomplete for 1940–1945.

| Date | Number Commercial Sales | Number Residential Sales | Total Number Sales |
|---|---|---|---|
| 1955 | 1 | 16 | 17 |
| 1956 | 1 | 6 | 7 |
| 1957 | 1 | 1 | 2 |
| 1958 | 1 | 3 | 4 |
| 1959 | 3 | 1 | 4 |
| 1960 | 1 | 0 | 2 |
| 1961 | 2 | 0 | 2 |
| 1962 | 1 | 0 | 1 |
| 1963 | 4 | 0 | 3 |
| 1964 | 6 | 0 | 4 |
| 1965 | 4 | 0 | 6 |
| 1966 | 7 | 0 | 5 |
| 1967 | 4 | 0 | 4 |
| 1968 | 1 | 0 | 3 |
| 1969 | 4 | 0 | 3 |
| 1970 | 1 | 0 | 1 |
| 1971 | 4 | 0 | 4 |
| TOTAL | 95 | 149 + | 244 + |