T.C. Memo. 2004-206


UNITED STATES TAX COURT


TIMOTHY J. PHELAN AND DEBORAH A. PHELAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14036-02.          Filed September 15, 2004.


<u>James E. Nesland</u> and <u>Jeffrey A. Smith</u>, for petitioners.

<u>Frederick J. Lockhart, Jr.</u> and <u>John A. Weeda</u>, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

GERBER, <u>Chief Judge</u>:  Respondent determined a deficiency in
petitioners' Federal income tax for 1998 of $272,712.  The sole
issue in dispute is whether the gains on sales of realty are
capital gains or ordinary income.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT[1]

Petitioners resided in Colorado Springs, Colorado, at the time their petition was filed. During 1994, real estate agent Jim Perry contacted Timothy J. Phelan (petitioner) and informed him that a 1,050-acre parcel in Regency Park was soon to be listed for sale. Having grown up in the vicinity of the Regency Park property, petitioner and his brother, Thomas Phelan, were familiar with the property. During 1994, petitioner, his brother, and Robert Oldach (Oldach), with the sole purpose of investing in the 1,050-acre parcel, organized Jackson Creek Land Co. (JCLC) as a limited liability corporation in the State of Colorado. At all relevant times, petitioner owned a 40-percent interest in JCLC, petitioner's brother also owned a 40-percent interest, and Oldach owned the remaining 20-percent interest. The members of JCLC did not own real estate licenses.

The Regency Park property consisted of 1,776 acres of unimproved real estate that was acquired during the early 1980s by the Regency Group, a residential real estate developer.

---

[1]The parties' stipulation of facts is incorporated by this reference.

Regency Park was located within the geographical limits of the Triview metropolitan district (Triview). Triview is an independent quasi-municipal corporation and political subdivision organized under the laws of Colorado. Its purpose was to provide services to the residents of the district, such as building roads, providing water and sanitation services, and building and maintaining parks. For funding purposes, Triview had the ability to levy taxes, issue general obligation and revenue bonds, and assess fees.

During 1987, Triview entered into two agreements obligating itself to construct improvements to the infrastructure of the Regency Park property. After the approval of a master plan, Regency Group and Triview, on March 6, 1987, entered into a Tap Fee Agreement. Under the agreement, Triview was to construct water and sewer improvements to Regency Park, and Regency Group would remit an initial payment and additional ongoing fees for water and sewer taps. On September 22, 1987, Triview, Regency Group, and two other partnerships that owned property within the Triview district, entered into an Intergovernmental Agreement with the town of Monument, Colorado. Under its terms, Triview agreed to construct several public facilities within the Triview district, including roads, water and sanitation plant facilities, parks, and traffic control systems. Regency Group agreed to be responsible for the construction of infrastructure to deliver the

water, sewer, and irrigation services to the land.  The agreement also allowed for Regency Group to assign this duty to Triview.

Also during 1987, the adjacent town of Monument and several land owners agreed to expand Monument's town limits to include more residential housing and business areas.  On September 22, 1987, the town of Monument annexed Regency Park and other areas into its city limits pursuant to an Annexation and Development Agreement with Regency Group and owners of the other land.  The agreement further referenced Triview's obligation under the Intergovernmental Agreement to construct several public facilities within the Triview district, including roads, water and sanitation plant facilities, parks, and traffic control systems.  JCLC was not a party to the Intergovernmental Agreement.

In conjunction with the Annexation and Development Agreement, the town of Monument passed Annexation Ordinance No. 13-87, rezoning the 1,776 acres of Regency Park into a planned development zone consisting of 1,674 acres.  The development zone designated areas for single-family and multifamily homes, commercial buildings, and industrial buildings.  Landowners within the development zone could not build on their land until they obtained a final site plan approval from the town of Monument.

Soon thereafter, Regency Group filed for bankruptcy. Several years later, on March 3, 1993, the J&L Higby Trust (Trust) purchased Regency Park from foreclosure proceedings instituted against Regency Group.

On October 31, 1994, the Trust sold the 1,050-acre portion of the original 1,776-acre Regency Park parcel to petitioner for $2.9 million. The special warranty deed from the Trust to petitioner reflected that the conveyance was made subject to the Tap Fee Agreement, the Intergovernmental Agreement, and the Annexation and Development Agreement. At the time of purchase, petitioner and the other members of JCLC were aware that residential housing was planned for the 1,050-acre parcel and that Triview was obligated to construct infrastructure improvements on the property.

Approximately 1 month later, on December 7, 1994, petitioner quitclaimed the 1,050-acre parcel to JCLC for the same $2.9 million purchase price and the property was renamed Jackson Creek. At the time of this transaction, the intent of JCLC and its owner was to hold the property as a long-term investment. Conforming to that intent, JCLC did not advertise the Jackson Creek property for sale or hire sales agents or representatives to sell the property.

During 1996 a Preliminary Geological Investigation was conducted on the Jackson Creek property to evaluate subsurface conditions for the development of the property. Prior to the sales of the Jackson Creek property by JCLC, amended and final development plans were approved by the town of Monument, which enabled the commencement of construction. Approximately 1 year later, a representative from Elite Properties of America Corp. (Elite), inquired whether JCLC was willing to sell a portion of the Jackson Creek property. After negotiations, JCLC entered into a Purchase and Sale agreement with Elite on August 28, 1997. The agreement was amended on March 19, 1998, to permit conveyance to Elite of 102.215 acres of the Jackson Creek property. The amended agreement was to occur by means of three separate closing transactions.

The first closing occurred on June 15, 1998, when a portion of the Jackson Creek property was conveyed for $792,880. JCLC's 1998 partnership return reflected a long-term capital gain of $607,344 with respect to this transaction. Petitioner reported his distributive share of the gain on his 1998 Federal income tax return. The second and third closings occurred during 1999 and 2000, respectively. The March 19, 1998, amended agreement also included terms requiring JCLC to cause Triview to install and maintain irrigation and landscaping within the parcel, and for JCLC, at its sole expense, to be responsible for any grading,

utility installation, or roadway improvements required by the town of Monument in connection with the development of the property. Despite JCLC's obligation under the agreement, Triview completed all development work with respect to the Jackson Creek property.

Vision Development Corp. (Vision) was organized during 1996 by petitioner, petitioner's brother, and Oldach, with the same ownership interests as that of JCLC of 40 percent, 40 percent, and 20 percent, respectively. On January 5, 1998, JCLC conveyed a 46.5-acre portion of Jackson Creek to Vision in exchange for $1,571,145. JCLC's 1998 partnership return reflected a long-term capital gain of $47,319 with respect to this transaction, and petitioner reported his distributive share of the gain on his 1998 personal Federal income tax return. Vision was organized to develop the 46.5-acre parcel for resale to Keller Homes (Keller). Keller, a home builder, was originally interested in buying the same parcel from JCLC. Keller was not interested in purchasing the 46.5-acre parcel unless it was developed and suitable for residential home building. After Elite expressed no interest in developing the parcel for Keller, Vision was formed to perform the development work and resell the property to Keller.

Despite terms in the contracts prescribing that JCLC was to be responsible for some development activities, Triview completed all infrastructure development work that was performed on each

parcel of Jackson Creek property prior to the sales from JCLC to Elite and Vision. As of 1996, however, Triview was experiencing financial difficulty and was in default on general obligation bonds issued in 1987 with a face value of $4.8 million and accrued interest of approximately $3 million.

Petitioner, his brother, and Oldach, in their personal capacities and/or through the business entities which they owned, executed three investment and financing transactions that were related to Triview and Jackson Creek. In addition to JCLC and Vision, petitioner, his brother, and Oldach held ownership interests in two additional entities which were parties to these transactions.

One such entity was Centre Development Co. of Colorado Springs, LLC (Centre). It was formed on July 27, 1993, for the purpose of acquiring a shopping center. At all relevant times, petitioner, petitioner's brother, and Oldach possessed ownership interests in Centre of 40 percent, 40 percent, and 20 percent, respectively.

The second entity was Colorado Structures Corp. (Colorado Structures). Petitioner and his brother together owned a 49-percent interest in Colorado Structures. The remaining 51 percent is owned by an employee stock ownership plan (ESOP). During 1998 petitioner served as the president of Colorado Structures. Other officers were Oldach who served as

vice president, and petitioner's brother, who served as secretary-treasurer.

Colorado Structures is a commercial general contractor which contracts to build commercial buildings such as large retail stores, office buildings, and schools. During 1998, Colorado Structures did not contract to build residential buildings. In 1998, the company employed approximately 50 people and earned revenues of approximately $117 million.

During 1996, Centre purchased general obligation bonds which Triview had issued in 1987 and subsequently defaulted on. In exchange for $2.9 million, Centre received the bonds with a face value of $4.8 million and accumulated unpaid interest of approximately $3 million. Centre purchased the bonds from Massachusetts Financial and Kemper Financial. Centre financed the purchase through a stock brokerage margin account and a loan in the amount of $1.5 million from a consortium of Mountain States Telephone and Telegraph Co. and Mountain View Electric Association (utility companies).

In order to refinance the $1.5 million in loans from the utility companies, Centre and JCLC borrowed the same amount from Colorado National Bank (CNB) on September 22, 1997. Under the terms of the loan agreement, the borrowers were Centre and JCLC, and the guarantors were petitioner and his brother in their personal capacities, as well as Colorado Structures. As

collateral, Centre pledged the 1987 Triview bonds and mortgaged two buildings it owned, and JCLC placed a mortgage on the Jackson Creek property. JCLC did not receive any of the proceeds from this loan. JCLC was designated as a borrower on the loan so that the Jackson Creek property could be used as collateral.

Under a separate agreement, the utility companies agreed to commit the $1.5 million they received from Centre's repayment of the loans to Triview. In exchange, Triview issued new bonds to the utility companies in the amount of $1.5 million. In addition, during 1998 and 1999 Colorado Structures purchased newly issued Triview bonds.

Also on September 22, 1997, Vision and JCLC agreed to a revolving development loan of $600,000 from CNB. Petitioner and his brother personally, as well as Colorado Structures and Centre, served as guarantors on the loan. The purpose of the loan was to finance the infrastructure development of a specific parcel of the Jackson Creek property described in the agreement as being 184.627 acres in size. Among other terms, the loan agreement required Vision to enter into contracts with qualified homebuilders for the sale of the land, subject only to Vision's completion of development activities. The loan agreement also included a borrowing limit of 75 percent of the value of the sales contracts. Collateral for the loan included, inter alia,

the assignment of the sales contracts to CNB and a mortgage on the Jackson Creek property.

## OPINION

This case presents the purely factual question of whether gain from the sale of real property resulted in ordinary or capital gain income. Petitioner, his brother, and Oldach acquired real property that was intended for residential development. Petitioner and the others generally earned their income from and were involved in commercial real estate development. The property in question was held by a passthrough entity which had no purpose and engaged in no significant activity other than to hold the acquired realty for appreciation and sale. Respondent, because of petitioner's involvement in commercial real property development, questioned whether gain from the sale of the property should be reported as capital gain or ordinary income. After considering all of the evidence, we find as an ultimate fact and hold that the gain was capital in nature.

JCLC, a limited liability company formed under the State laws of Colorado, filed a U.S. Partnership Return of Income for Federal income tax purposes. See sec. 301.7701-2(b), Proced. & Admin. Regs. Petitioner's distributive share of income from JCLC is of the same character as that realized by JCLC upon the sale of the Jackson Creek parcels. See sec. 702(b). In order to

decide the question of whether petitioner's distributive share should be characterized as ordinary or capital gain income, we must consider the character of the gain at the entity level. Cannon v. Commissioner, 949 F.2d 345 (10th Cir. 1991), affg. T.C. Memo. 1990-148; see Brannen v. Commissioner, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Podell v. Commissioner, 55 T.C. 429 (1970). More particularly, we must decide whether JCLC held the Jackson Creek property for sale in the ordinary course of its business or whether it was held as a capital asset.

Section 1201(a) provides for preferential treatment with respect to gain realized on the sale of a capital asset. See sec. 1201(a). Section 1221(1) defines a capital asset as "property held by the taxpayer * * * but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business."

Whether property held by a taxpayer was sold in the ordinary course of business is a question of fact.[2] See Friend v. Commissioner, 198 F.2d 285, 287 (10th Cir. 1952), affg. a Memorandum Opinion of this Court. The term "primarily" for purposes of section 1221 means "of first importance" or "principally." See Malat v. Riddell, 383 U.S. 569, 572 (1966).

---

[2]No question has been raised with respect to the burden of proof under sec. 7491(a).

In determining whether gains realized by JCLC from the 1998 sales of the Jackson Creek property were capital gains or income derived from the sale of the property in the ordinary course of business, we make three factual inquiries: (1) Was JCLC engaged in a trade or business, and, if so, what business? (2) Was JCLC holding the property primarily for sale in that business? (3) Were the sales contemplated by JCLC ordinary in the course of that business? Sanders v. United States, 740 F.2d 886, 888-889 (11th Cir. 1984); Suburban Realty Co. v. United States, 615 F.2d 171, 178 (5th Cir. 1980).

The Court of Appeals for the Tenth Circuit, to which this case would be appealable barring stipulation to the contrary, articulated the following factors to be considered in making this determination:

> the purposes for which the property was acquired; the activities of the taxpayer and those acting in his behalf or under his direction, such as making improvements or advertising the property to attract purchasers; the continuity and frequency of sales as distinguished from isolated transactions; and any other fact which tends to indicate whether the sale or transaction was in furtherance of an occupation of the taxpayer. [Friend v. Commissioner, 198 F.2d at 287.][3]

_____

[3]Although these factors evolved in connection with the Court's consideration of sec. 117 of the 1939 Internal Revenue Code, the statutory language is identical to that of sec. 1221(1), as in effect during the 1998 tax year, and the factors established in Friend v. Commissioner, 198 F.2d 285, 287 (10th Cir. 1952), affg. a Memorandum Opinion of this Court, continue in use by the courts.

No one factor is determinative, and neither is the presence or absence of any single factor determinative. Each case is considered in light of its own facts and circumstances. See Victory Housing No. 2, Inc. v. Commissioner, 205 F.2d 371, 372 (10th Cir. 1953), revg. 18 T.C. 466 (1952).

I. Purpose of Acquisition

With respect to JCLC's purpose of acquisition, it was organized with the intent and for the purpose of purchasing the Jackson Creek property and holding it for investment and appreciation in value. JCLC purchased the Jackson Creek property with knowledge that the land would eventually be developed into residential housing. The initial master plan to develop the property was approved by the town of Monument, and the town enacted an annexation ordinance rezoning the property, subject to final site approval. In addition, pursuant to the Tap Fee Agreement, the Intergovernmental Agreement, and the Annexation and Development Agreement, Triview was obligated to improve the land and prepare it for further development. The investors in JCLC were familiar with these aspects and acquired and held the property for its appreciation in value.

Although the purpose for the acquisition of property is of some weight, ultimately, the purpose for which property is held is of great significance. Mauldin v. Commissioner, 195 F.2d 714,

717 (10th Cir. 1952), affg. 16 T.C. 698 (1951); see also Cottle v. Commissioner, 89 T.C. 467, 488 (1987).

II. Activities of the Taxpayer and Those Acting in the Taxpayer's Behalf--Such as Making Improvements or Advertising for the Sale of the Property

With respect to the second factor, the sales of JCLC's unimproved realty by JCLC were unsolicited. The owners of JCLC, including petitioner, did not hold real estate or broker's licences. JCLC did not advertise the property for sale or hire representatives to assist in selling the property. Respondent, however, argues that the development activities performed on the Jackson Creek property by Triview were done on behalf of JCLC and petitioner or at petitioner's direction. Respondent relies on the sales agreement with Elite requiring that JCLC be responsible for some infrastructure improvements. Respondent also argues that the loan agreements between Vision, JCLC, and CNB, and the purchase of Triview bonds by Centre and Colorado Structures provided the financing for Triview's development activities. In that regard respondent argues that these financing arrangements caused Triview to operate under the direction of JCLC. Respondent's argument is based on the fact that there was common ownership of JCLC, Centre, Vision, and Colorado Structures.

Petitioner acknowledges that JCLC was contractually obligated for some improvements to the Jackson Creek property, but petitioner notes that Triview was not contractually obligated

to Elite for the completion of the improvements.  As a result, the term was included as a means for Elite to have a contractual remedy with respect to JCLC should Triview fail to complete the improvements.  Petitioner also points out that the loans and bond purchases of Centre, Vision, and Colorado Structures did finance Triview's activities, but they did not give JCLC the means to direct Triview's development activities.

While JCLC was responsible for limited improvements to the land it sold to Elite, JCLC did not have employees or engage in any business activities outside of holding and selling a limited number of parcels of the Jackson Creek property.  JCLC relied on the existing contractual obligation of Triview to complete the improvements.  Had Triview failed to complete the improvements, JCLC was contractually obligated to do so, but JCLC was without the ability to complete the improvements itself.  Elite had contractual recourse against JCLC, and JCLC would have had contractual recourse against Triview.  In the course of events, Triview satisfied its obligation and completed the development work.  Accordingly, the contractual obligation in of itself, did not give rise to development activity on the part of JCLC.

Centre, which had similar ownership interests to those of JCLC, purchased Triview bonds, issued in 1987, at a discounted price of $2.9 million.  That payment represented approximately 40 percent of the $4.8 million face value of the bonds, along with

approximately $3 million of accrued interest.  In addition, Colorado Structures also purchased newly issued 1998 and 1999 Triview bonds.

Centre financed $1.5 million of the purchase price of the bonds through loans obtained through two utility companies. Centre subsequently refinanced the $1.5 million through CNB. Under a separate agreement, the utility companies agreed to commit the $1.5 million they received from Centre's repayment of the loans to Triview.  In exchange, Triview issued new bonds totaling $1.5 million to the utility companies.  The $1.5 million in new working capital assisted Triview in performing development activities, but neither Centre or JCLC had the ability to control the purpose for which the funds were used.  Further, there is no evidence in the record to support respondent's assertion that land owned by JCLC, and not other property within the Triview district, was the recipient of Triview's development activities resulting from this infusion of cash.

With respect to the bond purchases, respondent makes much of the fact that petitioner, his brother, and Oldach each owned identical interests in Centre and JCLC, as well as being officers of Colorado Structures.  As such, respondent argues that the bond purchases caused Triview to act on JCLC's behalf or under its direction.  Respondent's argument, however, fails to take into account the fact that the bond purchases were all arm's-length

investment transactions. The investment risk for petitioner, his brother, and Oldach, through Centre, JCLC, and Colorado Structures, focused on Triview's potential success in developing infrastructure for the Triview district; taxing and assessing fees as a result of the development activity; and repaying the bonds it issued, including interest. Triview was independent in its control and management, and the risk of loss on the bonds purchased by Centre and Colorado Structures was the same as that of any other uninterested investor. The risk included mismanagement of finances and operations, which given Triview's previous insolvency, may have been substantial. We conclude that Triview's development activities were not made on behalf of or for the direct benefit of JCLC.

Respondent next argues that the 1998 sale of parcels by JCLC to Vision was done solely for tax avoidance and had no independent business purpose. In that regard, respondent asserts that the development activities performed by Vision should be attributed to JCLC, resulting in JCLC's holding the property for sale in the ordinary course of business.

In Bramblett v. Commissioner, 960 F.2d 526, 528 (5th Cir. 1992), revg. T.C. Memo. 1990-296, the Court of Appeals for the Fifth Circuit analyzed a similar factual situation to the one we consider here. In that case, the taxpayer was a partner in a partnership formed to acquire land for investment purposes. The

taxpayer and his partners subsequently formed a separate corporation for the purpose of developing and selling real estate. The partners held ownership interests in the corporation in the same proportions as they did in the partnership. The partnership later sold land to the corporation for development. The Court of Appeals for the Fifth Circuit held that the record reflected that the business activities of the corporation were not attributable to the partnership.

The Court of Appeals for the Fifth Circuit relied on the holding of the Supreme Court to the effect that where the form chosen by the taxpayer "'is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features'", the form should be honored by the Government. Id. at 533 (quoting Frank Lyon Co. v. United States, 435 U.S. 561, 583 (1978)); see also Lemons v. Commissioner, T.C. Memo. 1997-404. The Court of Appeals for the Fifth Circuit found it significant that the Commissioner had accepted the fact that the partnership and corporation were separate business entities and that the corporation was not a sham. The Court of Appeals also found significant the fact that there was an independent business reason to organize the corporation, that being to protect the partnership from unlimited liability from a multitude of sources.

Respondent contends that no legitimate business purpose prompted the incorporation of Vision because, as members of a limited liability company, the members of JCLC did not have a need to protect themselves from unlimited liability as was the case for the partners in <u>Bramblett</u>. Conversely, petitioner contends that he, his brother, and Oldach possessed a legitimate business reason to organize Vision. Although the members of JCLC were not exposed to unlimited liability as were the partners in <u>Bramblett</u>, by incorporating Vision to perform development work on a relatively small parcel of land, they protected JCLC's sole asset, the remaining land, from obligations arising from Vision's development activity. For those reasons and because Vision was organized for a legitimate business purpose and all corporate formalities were followed, we conclude that Vision's development activity is not attributable to JCLC.

III. <u>The Continuity and Frequency of Sales as Distinguished From Isolated Transactions</u>

In determining whether property was held for sale in the ordinary course of business, the frequency and substantiality of sales is the most important factor to be considered. See <u>Suburban Realty Co. v. United States</u>, 615 F.2d 171, 176 (5th Cir. 1980); <u>Medlin v. Commissioner</u>, T.C. Memo. 2003-224; <u>Hancock v. Commissioner</u>, T.C. Memo. 1999-336. Frequent and substantial sales of real property more likely indicate sales in the ordinary course of business, whereas infrequent sales for significant

profits are more indicative of real property held as an investment. See Bramblett v. Commissioner, supra at 531; Hancock v. Commissioner, supra.

JCLC purchased the Jackson Creek property in 1994 and held it for approximately 4 years before selling parcels to Elite and Vision in 1998. In a case cited by respondent, the taxpayer was in the real estate business, but they maintained that the purpose for holding the property switched to investment when the taxpayer began full-time activity in the lumber business. See Mauldin v. Commissioner, 195 F.2d at 716. During an 8-year period the taxpayer sold real property in 25 separate transactions. The Court of Appeals for the Tenth Circuit agreed with this Court's holding that the taxpayer's transactions in Mauldin were sufficiently substantial and frequent to be sales in ordinary course of the taxpayer's business. The Court of Appeals found it important that a significant portion of the taxpayer's income was derived from the sale of real estate.

In arguing that JCLC's sales were sufficiently frequent and substantial, respondent emphasizes that substantially all of JCLC's 1998 income derived from gains on the sale of real property. We do not find this fact to be fatal, as JCLC does not engage in any other activity from which it could economically benefit, and two sales of real property by JCLC in 4 years were of insufficient frequency to support the conclusion that JCLC's

sales were in the ordinary course of its business.  More importantly, JCLC held the property for 4 years during which time the value appreciated.  JCLC began selling the property at a time when it was believed that the investment and appreciation goals had been achieved.

IV.  Other Facts

During October 1996 a Preliminary Geotechnical Investigation was done on behalf of JCLC for a cost of $2,200.  The purpose of the report was to evaluate soil conditions for the development of the property.  In addition the amended and final development plans for the parcels sold to Elite and Vision were approved by the town of Monument prior to the 1998 completion of the sales transactions.  Respondent argues that these facts are indicative of development activity with respect to JCLC.

In Thrift v. Commissioner, 15 T.C. 366 (1950), the taxpayer improved and developed property for the purpose of facilitating the disposition of the property to a limited group of builders to whom the taxpayer had already reached agreement.  In that case, we held that the taxpayer's course of conduct did not establish any ordinary "course of business as to the sale of lots such as is required to convert the property from the character of a capital asset held for investment purposes to property held for sale in the ordinary course of * * * business."  Id. at 371.  We reach the same conclusion here.  The soil test and obtaining

preliminary and final site plan approvals for the Jackson Creek property are less significant than the activities performed by the taxpayer in Thrift.

Further, in Buono v. Commissioner, 74 T.C. 187, 204 (1980), we noted that "many cases have allowed capital gains treatment for taxpayers who subdivided their property even though improvements have been made thereto".  JCLC purchased the Jackson Creek property as an investment for appreciation in value and subsequent sale.  Prior to JCLC's purchase of the property, it had been rezoned by the town of Monument for residential purposes.  The soil test was performed to ensure that the land was suitable for its intended purpose.  Further, in the context of this case, JCLC's efforts in obtaining approval of site plans is not, by itself, indicative of development activity.

V.  Conclusion

Based on our analysis of the foregoing factors, we conclude that JCLC held the Jackson Creek property as an investment, and therefore was not engaged in the real estate development business.  Accordingly, we hold that petitioner's distributive share of income attributable to gain on the sale of property by JCLC during 1998 is properly characterized as income from a capital asset.  Sec. 1221(1).

To the extent not herein discussed, we have considered all other arguments made by the parties and conclude that they are moot or without merit.

To reflect the foregoing.

<u>Decision will be entered</u>

<u>for petitioners</u>.