T.C. Memo. 2018-21

UNITED STATES TAX COURT

SUGAR LAND RANCH DEVELOPMENT, LLC, SUGAR LAND ADVISORS,
LLC, TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5835-16.                               Filed February 22, 2018.

George W. Connelly, Jr., and Rita Renee Huey, for petitioner.

Candace M. Williams and Carol Bingham McClure, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

THORNTON, Judge: Pursuant to section 6223[1] respondent issued a notice

of final partnership administrative adjustment (FPAA) for 2012 to Sugar Land

---

[1]All section references are to the Internal Revenue Code in effect at all
relevant times, and all Rule references are to the Tax Court Rules of Practice and
Procedure, unless otherwise indicated. Monetary amounts are rounded to the
nearest dollar. Acreages are rounded to the nearest tenth of an acre.

[*2] Advisors, LLC (SLA), the tax matters partner of Sugar Land Ranch Development, LLC (SLRD).[2] The FPAA recharacterizes net gains from SLRD's sales of two parcels of real property in 2012 from capital gains to ordinary income (all other adjustments are computational). Petitioner filed a timely petition contesting these adjustments.

FINDINGS OF FACT

SLRD was established as a Texas limited liability company on February 27, 1998.[3] It was formed principally to acquire contiguous tracts of land in Sugar Land, Texas, just southwest of Houston, and to develop that land into single-family residential building lots and commercial tracts. On or about March 18, 1998, SLRD purchased approximately 883.5 acres. An additional 59.1 acres was conveyed to SLRD on or about November 24, 1998. We sometimes refer to all this acreage collectively as the property.

---

[2]When the petition was filed, Texas was the principal place of business for SLRD.

[3]SLRD is owned by Sugar Land Holding Corp. (SLHC) (85%) and SLA (15%). SLHC is owned by Lawrence Wong and Rocky Lai. SLA is owned by Omni Investments LP (33.33%) and Larry Johnson (66.67%). Omni Investments LP is owned by Larry Johnson's spouse Suzanne Johnson (99.9%) and Omni Investments GP, LLC (0.1%). Omni Investments GP, LLC is owned by Larry Johnson (33.33%) and Suzanne Johnson (66.67%).

[*3]    The property had formerly been an oil field and was west of, and adjacent to, the Riverstone Master-Planned Community (Riverstone Community), which was being developed by parties related to SLRD. SLRD's original plan was to clean up the property and subdivide it into residential units for inclusion in the Riverstone Community. To that end, between 1998 and 2008 SLRD capped oil wells, removed oil gathering lines, did some environmental cleanup, built a levee, and entered into a development agreement with the City of Sugar Land, Texas, which specified the rules that would apply to the property, should it be developed.

SLRD sold or otherwise disposed of relatively small portions of the property between 1998 and 2008. The 824.7 acres SLRD continued to own as of 2008 were contiguous but divided by three easements. The first easement, the HLP easement,[4] ran generally from north to south near the eastern end of the property. The second easement was for a planned road, University Boulevard, and ran from east to west. Finally, there was an easement for a levee running generally from north to south near the western end of the property.[5]

---

[4]The record does not disclose what "HLP" stands for, though we note that it resembles the acronym for Houston Lighting & Power.

[5]By 2016 SLRD had sold or conveyed all the land east of the HLP easement, apparently to related parties. The tax treatment of the parcels east of the HLP easement is not in dispute, although respondent argues that the characterization of

(continued...)

[*4]    The land west of the HLP easement consisted of four large parcels.  The westernmost parcel comprised all the land below the levee, i.e., on the river side of the levee; it was eventually conveyed to the City of Sugar Land.[6]  The remaining three parcels (comprising all the acreage between the levee and the HLP easement --a total of approximately 580.2 acres) were sold to a major homebuilder, Taylor Morrison of Texas, Inc. (Taylor Morrison), in 2011 and 2012.  We will refer to these parcels as TM-1, TM-2, and TM-3 (collectively, the TM parcels).[7]

Late in 2008 the managers of SLRD--Larry Johnson and Lawrence Wong-- decided that SLRD would not attempt to subdivide or otherwise develop the property it held.  From their long experience in the real estate development business, they believed that SLRD would be unable to develop, subdivide, and sell

---

[5](...continued)
the gains or losses from those sales is relevant to determining the tax treatment of the sales which are at issue.

[6]This parcel appears to have been approximately 110 acres and seemingly could not be developed because it was below, i.e., on the river side of, the levee.  Other small portions of the property adjacent to the levee were also conveyed to the City of Sugar Land.

[7]TM-1 was 110.5 acres.  It abutted the HLP easement to the east and ran from University Boulevard north to the property line.  TM-2 was 396 acres and comprised the entire area south of University Boulevard between the levee and the HLP easement.  TM-3 was 73.7 acres.  It abutted TM-1 to the east and the levee to the west and ran from University Boulevard north to the property line.

[*5] residential and commercial lots from the property because of the effects of the subprime mortgage crisis on the local housing market and the scarcity or unavailability of financing for housing projects in the wake of the financial crisis. Instead, Messrs. Johnson and Wong decided that SLRD would hold the property as an investment until the market recovered enough to sell it off. These decisions were memorialized in a "Unanimous Consent" document dated December 16, 2008 (signed by Messrs. Johnson and Wong), as well as in an SLRD member resolution adopted on November 19, 2009, to further clarify SLRD's policy.

Between 2008 and 2012 the TM parcels "just sat there" (as Mr. Johnson credibly testified); that is, SLRD did not develop those parcels in any way. SLRD did not list the TM parcels with any brokers or otherwise market the parcels because SLRD's managers believed that there was no market for large tracts of land on account of the subprime mortgage crisis.

In 2011 Taylor Morrison approached SLRD about buying TM-1 and TM-3 (i.e., the 184.2 acres between the levee and the HLP easement and north of University Boulevard). Taylor Morrison ultimately decided to buy all three TM parcels. SLRD sold TM-1 to Taylor Morrison in 2011[8] and TM-2 and TM-3 to

_____

[8]The 2011 sale is not at issue in this case. Respondent asserts that SLRD reported the gains from the 2011 sale as ordinary income although the record is

(continued...)

[*6] Taylor Morrison on December 21 and 28, 2012, respectively. SLRD and Taylor Morrison executed two sale contracts for this purpose. One sale contract (TM-3 contract), which was executed by SLRD and Taylor Morrison, provided for the sale of TM-1 and TM-3 in 2011 and 2012, respectively. The second sale contract (TM-2 contract), which was executed by SLRD, Taylor Morrison, and Hillsboro Estates, LLC (a third party apparently related to SLRD), provided for the sale of TM-2 in 2012 and for the sale of a property directly to the south of TM-2 (which was owned by Hillsboro Estates, LLC).

The TM-2 and TM-3 contracts each called for Taylor Morrison to pay a lump sum to SLRD in 2012 for the largely undeveloped TM-2 and TM-3 parcels. The TM-2 contract also provided that Taylor Morrison was obligated to pay SLRD 2% of the final sale price of each future home eventually developed and sold out of TM-2. The TM-2 contract specified that each 2% payment would accrue when each home sale closed. SLRD was also to receive $3,500 for each plat recorded on TM-2. Unlike the TM-2 contract, the TM-3 contract did not provide for a 2% per-home payment, but did provide for a payment of $2,000 for each plat recorded on TM-3. The TM-2 and TM-3 contracts also listed other development

---

[8](...continued)
inconclusive on this point.

[*7] obligations for which the parties were responsible. These development obligations fell almost entirely on Taylor Morrison.

No part of the payments received by SLRD from Taylor Morrison in 2012 included either the 2% per-home or per-plat fees provided for in the TM-2 and TM-3 contracts. That is, the net gain at issue in this case represents only the lump-sum payments SLRD received in 2012 for the largely undeveloped TM-2 and TM-3 parcels. Respondent has not argued, nor does the record suggest, that the lump sums SLRD received in 2012 represent payment for anything other than the fair market value of the largely undeveloped TM-2 and TM-3 parcels.

After commencing the sale of the TM parcels, SLRD decided to close out its property holdings by conveying the remainder of its property to related parties (except for land that was eventually conveyed to the City of Sugar Land for no consideration and except for a one-acre parcel that appears to have been sold to a county) in four sales in 2012, 2013, 2014, and 2016. These parcels were all to the east of the HLP easement and were 86.9, 12.1, 32, and 2.2 acres, respectively. These parcels were ultimately included in the Riverstone Community and appear to have been developed by parties related to SLRD.

The record contains SLRD's Forms 1065, U.S. Return of Partnership Income, for 2005, 2006, and 2012. On these three returns, SLRD stated that its

[*8] principal business activity was "Development" and that its principal product or service was "Real Estate". On its 2012 Form 1065 SLRD reported an $11,086,640 capital gain from its sale of the TM-2 parcel and a $1,569,393 capital loss from its sale of the TM-3 parcel. In the FPAA respondent determined that the aggregate net income from these two transactions should be taxed as ordinary income.

OPINION

In this proceeding, we review under section 6226 respondent's adjustments to SLRD's 2012 partnership return.[9] The Commissioner's adjustments in an FPAA are generally presumed correct, and the taxpayer bears the burden of proving those adjustments erroneous. Rule 142(a); <u>Republic Plaza Props. P'ship v. Commissioner</u>, 107 T.C. 94, 104 (1996).

The issue presented is whether SLRD's sales of the TM-2 and TM-3 parcels should be treated as giving rise to capital gains or ordinary income. A capital

---

[9]Our jurisdiction is limited to determination of partnership items, allocation of partnership items among the partners, and the applicability of any penalty, addition to tax, or additional amount which relates to an adjustment to a partnership item. Sec. 6226(f). The only issue in this case is whether net proceeds of two of SLRD's sales in 2012 should be treated as capital gains or ordinary income. Items of gain of the partnership are partnership items. Sec. 301.6231(a)(3)-1(a)(1)(i), Proced. & Admin. Regs.; <u>see</u> sec. 6231. Therefore, we have jurisdiction over the issue presented in this case.

[*9] asset is "property held by the taxpayer (whether or not connected with his trade or business)" but excludes, among other things, "inventory" and "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". Sec. 1221(a)(1).

The Court of Appeals for the Fifth Circuit--the court to which this case is appealable absent a stipulation to the contrary, see sec. 7482(b)(1)(E)--has held that the three principal questions to be considered in deciding whether gain is capital in character are: (1) "[W]as taxpayer engaged in a trade or business, and, if so, what business?" (2) "[W]as taxpayer holding the property primarily for sale in that business?" And (3) "[W]ere the sales contemplated by taxpayer 'ordinary' in the course of that business?" Suburban Realty Co. v. United States, 615 F.2d 171, 178 (5th Cir. 1980).

The Court of Appeals for the Fifth Circuit has also indicated that various factors may be relevant to these inquiries: the frequency and substantiality of sales of property; the taxpayer's purpose in acquiring the property and the duration of ownership; the purpose for which the property was subsequently held; the extent of developing and improving the property to increase the sales revenue; the use of a business office for the sale of property; the extent to which the taxpayer used advertising, promotion, or other activities to increase sales; and the time and

[*10] effort the taxpayer habitually devoted to the sales. See id. at 178-179; see also Bramblett v. Commissioner, 960 F.2d 526, 530-531 (5th Cir. 1992), rev'g T.C. Memo. 1990-296; Biedenharn Realty Co. v. United States, 526 F.2d 409, 415 (5th Cir. 1976); United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); Maddux Constr. Co. v. Commissioner, 54 T.C. 1278, 1284 (1970). Frequency and substantiality of sales is the most important factor. Suburban Realty, 615 F.2d at 178.

## I. Capital Character of Net Gains From Sales

The parties agree that SLRD was formed to engage in real estate development--specifically, to acquire the property and develop it into single-family residential building lots and commercial tracts. The record supports this conclusion: SLRD's tax returns, the development agreement, SLRD's formation documents, and the testimony of Messrs. Johnson and Wong all clearly show that SLRD originally intended to be in the business of selling residential and commercial lots to customers.

But the evidence also clearly shows that in 2008 SLRD ceased to hold its property primarily for sale in that business and began to hold it only for investment. SLRD's partners decided not to develop the property any further, and they decided not to sell lots from those parcels. This conclusion is supported by

**[*11]** the highly credible testimony of Messrs. Johnson and Wong and by the 2008 unanimous consent and the 2009 member resolution. In fact, from 2008 on SLRD did not develop or sell lots from those parcels (and the evidence does not suggest that SLRD ever sold even a single residential or commercial lot to a customer at any point in its existence). Respondent concedes that SLRD never subdivided the property.

More particularly, when the TM parcels were sold, they were not sold in the ordinary course of SLRD's business: SLRD did not market the parcels by advertising or other promotional activities. SLRD did not solicit purchasers for the TM parcels, nor does any evidence suggest that SLRD's managers or members devoted any time or effort to selling the property; Taylor Morrison approached SLRD. Most importantly, sale of the TM parcels was essentially a bulk sale of a single, large, and contiguous tract of land (which was clearly separated from any other properties by the HLP easement and the levee) to a single seller--clearly not a frequent occurrence in SLRD's ordinary business.

Because the Taylor Morrison parcels were held for investment and were not sold as part of the ordinary course of SLRD's business, we hold that net gains from the sales of TM-2 and TM-3 were capital in character.

**[*12]** II.  Respondent's Arguments

Respondent argues that the extent of development of the TM parcels shows that these properties were held primarily for sale in the ordinary course of SLRD's business.  We are not persuaded.  It is clear that from 1998 to sometime before 2008 SLRD developed the property to a certain extent.  But it is also clear that in 2008 SLRD's managers decided not to develop those parcels into a subdivision and decided not to market the land as it ordinarily would have.  As the Court of Appeals for the Fifth Circuit held in Suburban Realty, 615 F.2d at 184, a taxpayer is "entitled to show that its primary purpose changed to, or back to, 'for investment.'"  SLRD has made such a showing.  Any development activity that occurred before the marked change in purpose in 2008 (including whatever respondent thinks was reported on SLRD's 2005 and 2006 Forms 1065) is largely irrelevant.

Respondent also argues that the frequency of sales, along with the nature and extent of SLRD's business, shows that gains from the sale of the TM parcels should be ordinary in character.  But SLRD's sales were infrequent, and the extent of SLRD's business was extremely limited.  After 2008 SLRD disposed of its entire property in just nine sales over eight years (not counting conveyances to the City of Sugar Land, for which SLRD received no consideration).  Cf. Byram v.

[*13] United States, 705 F.2d 1418, 1425 (5th Cir. 1983) (holding that although the taxpayer made 22 sales over a three-year period, the taxpayer did not hold the property for sale). Moreover, the TM parcels had not been developed into a subdivision when they were sold, and little or no development activity occurred on those parcels for at least three years before sale.

In any event, respondent's description of the pattern of sales after 2008 is inconsistent with the record. The TM parcels were on the western side of the HLP easement and were all sold to Taylor Morrison in a three-part transaction beginning in 2011. All of the other parcels sold by SLRD, i.e., parcels other than the TM parcels, were on the east side of the HLP easement and appear to have been conveyed to related parties (with the exception of a one-acre parcel sold to a county). The balance of the property was conveyed for no consideration (rather than sold) to the City of Sugar Land at various times. In sum, leaving aside the land that was conveyed for public use, after 2008 SLRD sold all of the undeveloped property west of the HLP easement (well over half its property holdings) in a single extended transaction to a single buyer, Taylor Morrison, and sold the remainder (all of which was to the east of the HLP easement) to related entities.

[*14] Respondent seems to suggest that we should impute to SLRD development activity which he says was performed on the eastern parcels by related parties. Respondent has not pointed us to legal authority or any evidence in support of this position. The caselaw appears to be to the contrary. See Bramblett v. Commissioner, 960 F.2d at 533-534 (rejecting argument that activities of corporation in selling and developing land should be attributed to partnership whose partners held ownership interests in the corporation); Phelan v. Commissioner, T.C. Memo. 2004-206 (similar). But even if we were to assume for the sake of argument that SLRD had substantial development activity on, or active and continuous sales from, the eastern parcels (by imputation or otherwise), nevertheless--in the absence of a connection between the eastern parcels and the TM parcels--we are not persuaded that the bulk sale of the TM parcels would have been in the ordinary course of SLRD's alleged development business, considering that all development activity had been halted on the TM parcels at least three years before the sales at issue and that the TM parcels were never developed into a subdivision by SLRD. As the Court of Appeals for the Fifth Circuit noted in Suburban Realty, 615 F.2d at 179 n.24, "if a taxpayer who engaged in a high volume subdivision business sold one clearly segregated tract in bulk, he might well prevail in his claim to capital gain treatment on the segregated tract." That is

[*15] precisely what happened here.  The TM parcels were clearly segregated from the other parcels by the levee and HLP easement and were sold in bulk to a single buyer.

Respondent argues that there was a connection between the TM parcels and the parcels east of the HLP easement:  (1) they were all covered by the same development agreement with the City of Sugar Land; (2) Taylor Morrison agreed to develop the TM parcels in accordance with various restrictions in the land sale deal; and (3) SLRD was to receive certain payments whenever certain conditions were met.

We think, however, that the facts respondent points out are either irrelevant to the adjustment in the FPAA or consistent with investment intent.  For example, there would have been no reason to undo or even modify the development agreement after deciding not to develop the TM parcels.  There seems to be little doubt that the highest and best use of this land was for development into residential and commercial lots.  Any buyer would likely have been a developer of some kind.  Maintenance of the development agreement was therefore consistent with both development intent and investment intent.  Cf. Suburban Realty, 615 F.2d at 178-179 ("[S]tanding alone, some degree of development activity is not inconsistent with holding property for purposes other than sale.").

**[*16]** As for the restrictions, we conclude that they were directed at ensuring that Taylor Morrison assumed any obligations or liabilities relating to the TM parcels and at ensuring that Taylor Morrison's actions would not decrease the value of the Riverstone Community as a whole. Such restrictions are not inconsistent with investment intent--a seller of property, whether an investor or a dealer, might reasonably draft the sale agreement so as to ensure that it would not retain personal liability with respect to the property or to ensure that the buyer would not decrease the value of adjoining properties the seller continues to hold.

Finally, the additional payments provided for in the TM-2 and TM-3 contracts are largely irrelevant to the adjustment at issue in this case. While it is true that the TM-2 and TM-3 contracts provided for various additional payments when a plat was recorded or when a home sale closed, the nature of these additional payments does not illuminate the character of the net gain at issue in this case. Respondent has not argued, nor does the record suggest, that either the lump sums paid in 2012 for the TM-2 and TM-3 parcels, or any of the additional payments, were incorrectly priced in the land sale contract. Additionally, it is clear from the record that the payments received by SLRD in 2012 for the TM-2 and TM-3 parcels did not include any additional per-lot or per-home payments (nor does the record support a conclusion that any additional per-lot or per-home

[*17] payments accrued in 2012).  Consequently, even if we were to assume that the additional payments would be treated as ordinary income if and when they should accrue, that circumstance would shed little light on the character of the net gain recognized in 2012 because the 2012 net gain included no such additional payments.  We also note that nothing in the land sale agreement (or in the record generally) suggests that SLRD was under any obligation to develop the TM parcels after the sale.

Next, respondent points out that on its 2012 Form 1065 SLRD listed its principal business activity as "Development" and its principal product or service as "Real Estate".  Although this circumstance may count against petitioners to some limited degree, we believe that these statements "are by no means conclusive of the issue."  See Suburban Realty, 615 F.2d at 181.  Considering the record as a whole, we are inclined to believe that these stock descriptions were inadvertently carried over from earlier returns.

Finally, on brief respondent asserts in passing that a stipulated schedule of SLRD's capitalized expenses shows that SLRD "continued to incur development expenses up until it sold the Taylor Morrison land."  But the record as a whole clearly shows that the TM parcels were not developed between 2008 and the sale to Taylor Morrison, and respondent concedes that SLRD never subdivided the TM

[*18] parcels (or any of its property). Also, most of the post-2008 expenditures on the schedule of capitalized expenditures are either consistent with investment intent or appear to have been incurred with respect to parcels other than the TM parcels.[10] For these reasons we accord the listing of capitalized expenses little weight--certainly not enough to override the factors in SLRD's favor, such as the infrequency of sales by SLRD (which is the most important factor in our analysis, see Suburban Realty, 615 F.2d at 178).

Therefore, on the basis of all the evidence, we conclude that SLRD was not engaged in a development business after 2008 and held the TM-2 and TM-3 properties as investments. Accordingly, we hold that SLRD properly characterized the gains and losses from the sales of these properties as income from capital assets.

To reflect the foregoing,

Decision will be entered for petitioner.

---

[10]There are two expenditures in 2011 and 2012 ($340,000 and $1,723,835, respectively) which are listed as "Management/Development Fees". Neither party has offered an explanation for these fees, but considering that similar fees were paid consistently each year from 1999 to 2006, and then were not paid again until 2011 and 2012 (when Taylor Morrison offered to purchase the TM parcels), it seems most likely that the 2011 and 2012 fees (if they even related to the TM parcels) were incurred as part of the sale process rather than as part of a continuing effort to develop the TM parcels.